# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 4, 2006        Decided January 12, 2007

No. 05-3146

UNITED STATES OF AMERICA,
APPELLEE

v.

GARREN J. ROY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00171-02)

*Kenneth D. Auerbach*, appointed by the court, argued the cause for the appellant.

*Jamila Z. Hoard*, Assistant United States Attorney, argued the cause for the appellee. *Kenneth L. Wainstein*, United States Attorney at the time the brief was filed, and *Roy W. McLeese III* and *Elizabeth Trosman*, Assistant United States Attorneys, were on brief.

Before: GINSBURG, *Chief Judge*, and HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Garren J. Roy was convicted by a jury of four criminal counts, including one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Roy appeals the district court's denial of his motion for a mistrial based on the court's inadvertent submission to the jury of an indictment which identified two specific predicate crimes to support the felon-in-possession count. Roy had previously stipulated his felon status. *See United States v. Jones*, 67 F.3d 320, 325 n.10 (D.C. Cir. 1995). Reviewing for plain error, we affirm the district court on the ground that the indictment's submission did not prejudice Roy given the extensive curative measures the district court undertook and the strength of the case against Roy.

## I.

On August 19, 2004, a second superseding indictment issued charging Roy with five counts of unlawful conduct: (1) possessing with intent to distribute 100 grams or more of phencyclidine (PCP) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iv); (2) possessing with intent to distribute cannabis in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); (3) using, carrying or possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1); (4) felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and (5) felon-in-possession of ammunition in violation of 18 U.S.C. § 922(g)(1). Before trial Roy moved to exclude evidence of his felon status, which the district court granted on July 9, 2004, directing that "the government prove the prior conviction for purposes of the essential element of th[e] 922(g) charge with a stipulation that does not identify the nature of the underlying crime" and that "the government not refer to the prior conviction, except as necessary, to explain [the] felony possession count to the jury." 7/9/04 Tr. 112.

Roy's trial began February 16, 2005 and concluded February 23, 2005. Viewed in the light most favorable to the government,

*see United States v. Garner*, 396 F.3d 438, 439 (D.C. Cir. 2005) (citing *United States v. Whitmore*, 359 F.3d 609, 613 (D.C. Cir. 2004)), the evidence established the following facts.

On the evening of March 12, 2004, a group of Metropolitan Police Department officers met near an apartment building at 1941 Naylor Road, S.E. in Washington, D.C. to execute a search warrant for apartment No. 1 based on suspected drug activity in the apartment. As the officers approached the building, they "could smell a strong smell . . . of PCP and marijuana." 2/17/05 Tr. 36. Several of the officers entered the building, knocked on the door to apartment No. 1 and announced their presence. When there was no response, they entered the apartment forcibly. Once inside, the officers again detected "the strong smell of PCP, the chemical odor associated with PCP, and the strong smell associated with that of marijuana," *id*. 49, and heard the sound of an interior door closing. The officers headed down the hallway toward a closed bedroom door and en route noticed a silver and black handgun lying on the kitchen counter. The officers kicked the bedroom door open and saw an older man, Edward Williams, sitting on the bed and Roy lying on the floor near the window. Meanwhile, officers posted outside the building and watching through the bedroom window had seen Roy run into the bedroom and attempt to exit through the window; when he discovered it was secured with bars, the officers saw him lie down on the floor between the bed and the window as if to hide. When the officers inside the bedroom questioned Williams about the gun on the kitchen counter, Roy told them the gun was his. While one of the officers detained Roy and Williams there, the other officers began to search the rest of the apartment.

In the kitchen, the officers found the aforementioned gun—a loaded "Keltec semi-automatic hand gun"—lying "within inches" of five glass vials of a clear liquid substance," *id*. 202, which was later identified as PCP; a "clear ziplock containing

numerous empty zips" lying "[w]ithin a foot" of the gun, *id.* 203-04; "a clear glass vial with residue inside of it," *id.* 204; a shoebox with a bag inside "containing 100 grams of a green weed substance, and $35," *id.* 204; another box containing "90 grams of a loose weed substance, and two clear zips containing green weed substance, and 14 zips with residue," *id.* 206; a green "cardboard box containing fourteen grams of a green weed substance, and a box of ammunition with 38 rounds of 38 special ammunition," *id.* 207; three more ziplocks containing "numerous" clear, black and red ziplocks, *id.* 207, 208; a "black ammunition pouch with one speed loader," *id.* 207; three more glass vials "with residue," *id.* 208, 209; and in the freezer a glass vial "with a clear liquid substance," a tin containing "68 silver foil wraps" and a glass containing a "brown weed substance," *id.* 209. The officers also recovered from various locations in the apartment, including a second bedroom, a plastic grocery bag containing "glass vials with residue," *id.* 210; a box containing 50 rounds of "ten millimeter ammunition," *id.* 210; a pair of "camouflage coveralls" with $595 in the left front pocket and $1,945 in the right front pocket, *id.*, 210-11; a "night vision scope" marked as property of the Prince George's County, Maryland government, *id.* 211; a "green holster," *id.* 212; a box containing 32 rounds of 380 caliber ammunition, *id.* 212; a blue backpack containing "392 rounds of assorted ammunition, and three magazines," *id.* 212-13; and a camouflage rifle case, *id.* 213.

Williams, who testified on behalf of the government pursuant to a plea agreement,[1] stated that Roy and his friends had frequented the apartment and kept clothes in the apartment's second bedroom for almost one year, ever since Williams's

---

[1]Williams, originally a co-defendant in this case, pleaded guilty on February 15, 2005 to "maintaining a premises for purposes of drug distribution" in violation of 21 U.S.C. § 856. 2/17/05 Tr. 140-41.

girlfriend, who was friendly with them, had moved out. A day or two before the search, Williams said, he was awakened around midnight by "a strong smell" of what he believed to be marijuana mixed with PCP. *Id.* 129-30. Williams went to the kitchen where he observed Roy at the kitchen counter with another man. Roy was dipping a small spoon into a jar of "[m]arijuana and PCP mixed" and packaging the "wet" marijuana into pieces of tinfoil, which he then folded and placed in "a little round can." *Id.* 131-32. Williams told Roy to get his drugs out of the apartment but Roy replied Williams should mind his own business and go back to his bedroom. *Id.* 133. According to Williams, he had changed the locks on the apartment but that did not keep Roy and his friends out and he was afraid to go to the police. Williams also testified that when he left for work at 4:00 a.m. the morning of March 12, 2004, he did not see the gun or drugs on the kitchen counter but when he returned that evening he saw the gun there and asked Roy why he had not removed it and the drugs from the apartment. In addition, Williams corroborated the officers' testimony that Roy had admitted owning the gun and that he had tried unsuccessfully to escape through the barred window.

For his part, Roy offered the testimony of his girlfriend and her mother to show that he in fact resided in the mother's house located next door to the Naylor Road apartment building and the testimony of a retired police officer to challenge the procedures used in handling and securing the seized evidence.

On the morning of February 23, 2005 the trial judge instructed the jurors and sent them to begin deliberating. After the jurors had left the courtroom, the judge suggested to counsel that the second superseding indictment be redacted before submitting it to the jury to delete a "notice of enhancement" clause that described alterations made to the gun. Both sides agreed and, after the clause was deleted, the judge asked his courtroom deputy to show the redacted indictment to counsel.

The prosecutor replied "Thank you," 2/23/05 am Tr. 17; defense counsel was silent. The judge then announced, "All right, that can go back." *Id*. That afternoon, the jury sent the judge a note that it had reached a verdict. Before the judge recalled the jury, defense counsel informed the court that the version of the indictment that went to the jury identified two predicate felony convictions for the felon-in-possession counts, namely, "Assault With Intent to Kill" and "Use of a Handgun in the Commission of a Crime of Violence." Second Superseding Indictment filed 8/19/2004 at 2-3. Defense counsel explained that she "did not notice when it went back originally" and therefore was "asking for a redacted indictment to go back." 2/23/2005 pm Tr. 3. She then clarified that she wanted a version without the two prior felonies to "go back to the jurors with a note stating that . . . the wrong person's indictment went back originally." *Id*. While the judge and counsel were still conferring, Roy informed his counsel that he wanted a mistrial and his counsel so informed the court. Without ruling on the mistrial request, the judge proposed to recall the jurors, tell them that the indictment they had been given "incorrectly named . . . a prior conviction"—in fact it erroneously identified one of the two prior convictions as assault with intent to kill rather than the actual predicate, assault with intent to disable—and send them back to "revisit their deliberations" with a different copy of the indictment that omitted the specific crimes of which Roy had been convicted. *Id*. 7-8.

Accordingly, the judge then recalled the jury and instructed it that the indictment he had given it "was not the charged document that should have been sent back to you," that it was "in error, particularly with respect to count four and five" and "the prior conviction identified in counts four and five of the indictment that you got was not what the defendant had been previously convicted of." 2/23/05 pm Tr. 11. He advised the jurors he would provide the correct indictment and told them:

> I want to ask you to resume your deliberations, because we want to make sure that whatever role the indictment may or may not have played in your deliberations was not affected by the incorrect copy of the indictment, and incorrect language that's in the copy that you got that erroneously lists incorrectly and identifies incorrectly a prior conviction in counts four and five. This is not what the defendant was previously convicted of. . . . I want to direct you to completely disregard and put out of your mind any consideration whatsoever of the identified prior conviction that you may have read in the copy of the indictment that was sent back to you in error . . . . It must not and may not play any role whatsoever in your consideration of what your verdicts should be.

*Id*. 11-12. He then repeated his instruction that the jurors must "disregard" the first indictment and that it "must play no role whatsoever" in their deliberations." *Id*. 12-13. The jury then returned to the jury room to resume deliberation.

Some thirty-five minutes later the judge informed counsel he had received two notes from the jury. The first note stated: "We the jury have reached a verdict on all counts." 2/23/05 Tr. 14. After reading it to counsel, the judge proposed to respond with a note requesting that the jurors indicate if any one of them was "incapable" of or "uncomfortable" with following his last instruction directing them to disregard the first indictment's reference to the prior convictions. *Id*. 15. When asked their thoughts on the procedure, counsel for each side replied "no objection." *Id*. The second note stated: "The jury is concerned with their safety. What is the procedure for leaving the building safely?" *Id*. The judge suggested to counsel that the jurors' concern might stem from "hav[ing] encountered in the courtroom or outside of the courtroom people that they may view as being the defendant's family." *Id*. Then, with the agreement of counsel, he sent the jurors a note that he was

"making special arrangements for [their] departure from the building." *Id*. 19. He also sent the jury the following note in accordance with his previous discussion with counsel:

Dear Jurors

It is imperative that ALL jurors follow the last instruction that I gave you in open court a while ago. If for ANY reason, ANY juror feels unable to faithfully follow my instruction, or feels uncertain about his/her ability to follow my instruction, I must ask you to say so now.

Does ANY juror feel unable to follow, or feel uncomfortable or uncertain about following, my instruction? Please check one:

_____ Yes            _____ No

If YES, please identify your juror seat number(s): _____

I await your response which I ask the foreperson to sign below.

Thank you

Appellant's App. 22. The note was signed by the judge and contained a space for the jury foreperson to fill in the date and time and to sign it. The jury returned the note with a checkmark in the space next to "No." *Id*. The judge then recalled the jury which returned a unanimous verdict of guilty on counts one through four and not guilty on count five. *Id*. 65. Following the verdict, the court deferred ruling on Roy's renewed mistrial motion to allow him to file a written motion.

At a hearing held August 3, 2005 the court denied Roy's motion for mistrial or, alternatively, a new trial. At the same hearing, the court sentenced Roy to concurrent prison terms of 78 months on the PCP count, 60 months on the cannabis count and 78 months on the felon-in-possession count, to be followed

by a term of 60 months on the section 924(c)(1) count and subsequently by concurrent supervised release terms of 4, 2, 3, and 2 years on counts 1 through 4, respectively.

Roy filed a notice of appeal on August 5, 2005.

## II.

Roy appeals the district court's denial of his mistrial motion on the ground that submission of the unredacted indictment to the jury improperly permitted it to consider as evidence of his guilt the prior convictions enumerated therein.[2] We review the denial of a mistrial for abuse of discretion. *United States v. Gartmon*, 146 F.3d 1015, 1027 (D.C. Cir. 1998) (citing *United States v. Williams*, 822 F.2d 1174, 1188 (D.C. Cir. 1987)). Further, because Roy did not object to the indictment before it was submitted to the jury—notwithstanding the court's invitation to counsel to inspect it—we review the denial for plain error. *See United States v. Thompson*, 27 F.3d 671, 673 (D.C. Cir. 1994) ("For purposes of determining our standard of

---

[2]Giving the jury a copy of the indictment appears to be common practice. *See* Ralph A. Jacobs, *White Collar Pretrial Motions*, 16 Litig., Jan. 1990, at 17, 20 ("In most courts, the indictment goes to the jury room, where it may become a road map for deliberations."). "[W]hether to permit the jury to have the indictment during deliberations is [a] decision committed to the [trial] court's discretion." *Dallago v. United States*, 427 F.2d 546, 553 (D.C. Cir. 1969). We assume that it would have been within the district court's discretion to submit a properly redacted indictment to the jury in this case. We note, however, that this practice often carries significant risks and has few corresponding benefits. *But cf. United States v. Chan Chun-Yin*, 958 F.2d 440, 444 (D.C. Cir. 1992) (court "mitigated" effect of overbroad knowledge instruction "by reading the indictment to the jury which contained the proper actual knowledge requirement and by allowing them to take a copy of it to the jury room to use during deliberations").

review of an alleged error in admission of evidence, however, a post-verdict motion for a new trial is not the same as a timely objection: the delay eliminates any chance that the judge could correct the error without a duplicative trial, and according review as if a timely objection had been raised virtually invites strategic behavior by defense counsel. Thus we review only for plain error.") (citations omitted); *United States v. Fennell*, 53 F.3d 1296, 1301 (D.C. Cir. 1995) (plain error review of judge's and prosecutor's references to unobjected-to previous felony indictment); *United States v. Myles*, 96 F.3d 491, 495 (D.C. Cir. 1996) (same for judge's reading of indictment count disclosing prior felony conviction); *cf. United States v. Dale*, 991 F.2d 819, 850-51 (D.C. Cir. 1993) (plain error review of jury instruction if objection not made "before the jury retires"). Under the plain error standard, " 'there must be (1) error, (2) that "affect[s] substantial rights"—*i.e.*, that is prejudicial . . . and the error must also be "plain." ' " *United States v. Alexander*, 331 F.3d 116, 125 n.12 (D.C. Cir. 2003) (quoting *United States v. Perkins*, 161 F.3d 66, 72 (D.C. Cir. 1998) (quoting Fed. R. Crim. P. 52(a))). "If these three conditions are met, 'an appellate court may then exercise its discretion to notice a forfeited error, but only if [] the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)) (alteration in original). "On plain error review, the defendant bears the burden of persuasion with respect to prejudice." *Id.* (citing *Perkins*, 161 F.3d at 72 n.6). Roy has not met his burden here.

In determining the extent to which a defendant has been unfairly prejudiced, "we consider a number of factors, including the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict." *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (citing *United States v. Eccleston*, 961 F.2d 955, 959-60 (D.C. Cir. 1992)). These factors do not weigh in favor of mistrial here.

First, we do not see what more the district judge could have done to "cure" the submission of the unredacted indictment. After removing the indictment from the jury's possession, he repeatedly and emphatically directed that it "disregard" the references to the "incorrect" prior conviction. He took the extra precaution of sending a note to the jurors before they returned their verdict stressing the importance of complying with his last instruction and asking if any one of them felt "unable to follow" the instruction or "uncomfortable or uncertain about following" it. The jurors expressly responded in the negative. These precautions were calculated to ensure that the jury did not consider the incorrect indictment in reaching its verdict and the jury's response confirmed that in fact it did not. " 'We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it . . . .' " *McLendon*, 378 F.3d at 1114 n.6 (quoting *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987)). We have no reason to doubt that the jurors followed the court's instruction here and disregarded the predicate crimes listed in the first copy of the indictment. Significantly, the judge did not simply direct the jurors to disregard the language in the incorrect indictment—a curative instruction a juror might, perhaps, have chosen to ignore; instead he repeatedly and emphatically explained to them that the first indictment they received was simply wrong in that the crimes it identified were *not* the crimes of which Roy was convicted. The jurors were therefore especially likely to follow his instruction to disregard the unredacted indictment rather than rely on information they knew to be incorrect.

Second, the case against Roy was strong. According to the testimony of two witnesses, Roy himself admitted that the gun belonged to him and Williams's testimony was that Roy and his friends used the apartment to prepare and store drugs. Further, the contraband seized from the apartment when the officers searched it—including the gun, PCP and marijuana and mixtures of the two and the copious preparation and packing

materials—left no doubt of the kind of drug activities occurring in the apartment, which Roy frequented and where he was arrested after his unsuccessful attempt to escape through the window. The only arguably exculpatory evidence was the testimony of Roy's girlfriend and her mother that he had lived with them in a house next door to the Naylor Road apartment building, a fact not inconsistent with Roy's use of the apartment to prepare and store illegal narcotics.[3]

Third, while one of the prior convictions identified in the incorrect indictment—"Use of a Handgun in the Commission of a Crime of Violence"—is, as the district court noted, "similar" to counts 3 and 4 of the indictment here—use of a gun during drug trafficking and felon-in-possession of a handgun—and therefore more likely to cause unfair prejudice, this similarity is outweighed by the other two factors, namely, the extensive curative measures and the weight of the evidence of guilt, including Roy's own admission that the gun belonged to him. Indeed, in *United States v. Myles*, *supra*, the trial judge, as part of his instruction on the felon-in-possession count, read aloud to the jury the portion of the indictment setting out the predicate felony which in that case was the *identical* crime of which the jury forthwith convicted him—possessing cocaine with intent to distribute. Yet we found no plain error based solely on "the strong evidence presented by the Government on the distribution count" which established that "the court's misstep did not affect the outcome of the trial." *Myles*, 96 F.3d at 497. Here, where

---

[3]We would ordinarily be hesitant to hold that curative instructions given after the jury has notified the court that it had reached a verdict are adequate. In this case, however, we find that despite the timing of the instructions Roy has failed to meet his burden of showing prejudice because the government's case against him was strong and, more important, because the error in the indictment allowed the trial judge to instruct the jury that the original indictment was incorrect instead of merely instructing it to disregard accurate information.

the judge took great pains to cure any effect of the jury's inadvertent exposure to the incorrect indictment and the prosecution's case was strong, we find that Roy has not satisfied his burden of proving that the submission of that indictment to the jury affected Roy's substantial rights so as to constitute plain error. Additionally, in these circumstances we cannot say that the error in this case "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" under the fourth prong of the plain error inquiry. *United States v. Olano*, 507 U.S. 725, 732 (1993) (citation and internal quotation omitted).

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered*.