# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 22, 2007         Decided December 21, 2007

No. 06-3056

UNITED STATES OF AMERICA,
APPELLEE

v.

CELICIA HOOVER-HANKERSON,
APPELLANT

---

06-3057

UNITED STATES OF AMERICA,
APPELLEE

v.

BENJAMIN HOOVER,
APPELLANT

---

Appeals from the United States District Court
for the District of Columbia
(No. 03cr00188-01)
(No. 03cr00188-02)

---

*Peter V. Taylor*, appointed by the court, argued the cause for
appellant Celicia Hoover-Hankerson. *Tony Axam, Jr.*, Assistant

Federal Public Defender, argued the cause for appellant Benjamin Hoover. With them on the briefs were *A. J. Kramer*, Federal Public Defender, and *Danny C. Onorato*.

*John C. O'Quinn*, Deputy Associate Attorney General, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III* and *Steven J. Durham*, Assistant U.S. Attorneys.

Before: RANDOLPH and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

RANDOLPH, *Circuit Judge*: Celicia Hoover-Hankerson and her brother, Benjamin Hoover, were convicted of conspiracy, theft from programs receiving federal funds and fraud. They were responsible for hundreds of false witness and investigator vouchers submitted for payment to the District of Columbia Superior Court. Indigent criminal defendants in the District are entitled to appointed counsel under the Criminal Justice Act (CJA). D.C. Code § 11-2601. Celicia was an attorney who earned her living representing CJA eligible defendants. Her brother was an investigator. When Celicia was practicing law, a CJA attorney could pick up blank witness vouchers from the Superior Court and sign them for witnesses she subpoenaed; the witnesses would submit the vouchers and receive a fee of $40.00 per day. A CJA attorney also could sign vouchers so that defense investigators would be paid from federal funds.

Between October 1998 and February 2001, Celicia signed out 2,087 witness vouchers. Her brother and another individual, Troy Robinson, then distributed the vouchers to family members or people living near the 1700 block of Euclid Street, none of whom had been witnesses. The recipients signed the vouchers, turned them in to the court office, kept some of the proceeds for themselves, and paid the rest to Robinson and Benjamin.

3

I.

There is not the slightest doubt about the guilt of both defendants. Celicia and her brother Benjamin present a large number of issues on appeal, not all of which deserve discussion. We will deal first with Benjamin's contention that the district court committed reversible error when it rejected his motion to continue the trial.

Benjamin filed his continuance motion just three days before trial. He based it on the grounds that he had been unable to meet with his attorney during the month before trial, and that his attorney was preoccupied with another case. A month before trial Benjamin's pregnant fiancé experienced serious medical problems. He was often at the hospital with her. This made it difficult for him to meet with his attorney, a problem exacerbated by the attorney's participation in a lengthy trial.

Benjamin claims that the court's refusal to continue the trial deprived him of the effective assistance of counsel, in violation of the Sixth Amendment. The question is whether the court's decision amounted to "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal citation and quotation marks omitted). The court's denial of a motion to continue is reviewed for an abuse of discretion. Among the factors to be considered is any prejudice the defendant suffered. *See United States v. Gantt*, 140 F.3d 249, 256 (D.C. Cir. 1998).

Benjamin unquestionably faced difficult circumstances on the eve of trial, but he had more than a year to meet with his attorney and prepare his defense. He was indicted in May 2003 and his attorney entered an appearance shortly thereafter. In November 2003, the court set a firm trial date of June 24, 2004.

Benjamin and his attorney had ample time to prepare for trial, and to consider whether to retain additional or alternative counsel in light of the court's trial calendar, which the court urged him to do if he thought it was necessary. Benjamin chose not to follow that course. In view of these considerations it was within the court's discretion to determine that Benjamin had been given sufficient time to prepare for trial.

In addition, Benjamin has no convincing claim of prejudice. *See Gantt*, 140 F.3d at 257. He says that his attorney was so busy with another trial that he failed to investigate the conflict that arose between his defense and that of his sister when she called Troy Robinson as a witness. Had his attorney looked into the matter, Benjamin continues, he would have filed a severance motion. But Benjamin's attorney did file a motion to sever in November 2003. As the government points out, the motion rested on the prospect of conflicting defenses. And as the government also notes, Benjamin's attorney demonstrated that he was well aware of Robinson's anticipated testimony. On the eve of trial he renewed Benjamin's severance motion and specifically referred to Robinson.

Benjamin also claims that he was prejudiced because his counsel was too busy to present a motion in limine to prevent Robinson from testifying. But shortly before Robinson testified, Benjamin's attorney did make, and the court rejected, arguments in support of that position. Nothing presented to us suggests that if the same arguments had been made in a pre-trial motion this would have changed the outcome.

## II.

Celicia has two complaints about the district court's handling of voir dire. The first is that the court refused to allow her to be physically present at bench conferences. She sees this

as a violation of her right to be present at trial, which Federal Rule of Criminal Procedure 43(a) and the Fifth Amendment guarantee.

In conducting voir dire, the district court asked questions of the group of potential jurors and had them record their answers. Individual jurors whose answers required follow-up questioning were brought to the bench where the court and counsel inquired further. Celicia's attorney asked if Celicia could be present at the bench. The court refused but provided her with a headset so that she could hear what transpired. She did not object.

The district court's decision to use a headset to protect the defendant's right to be present during a multiple-defendant trial is not error, let alone plain error, which is the standard of review when there has been no objection at trial. *United States v. Roy*, 473 F.3d 1232, 1237 (D.C. Cir. 2007). A defendant's right to participate in voir dire includes the opportunity "to observe and hear juror responses made at the bench." *United States v. Washington*, 705 F.2d 489, 497 (D.C. Cir. 1983). The headset fully preserved Celicia's right in this regard. The district court confirmed that the headset was operating and that she could hear what was said. The court also noticed that she engaged in conversations with her attorney throughout the process. It is thus impossible to see how she was prejudiced. *See id.* at 498.

Celicia's second complaint deals with her absence from the courtroom. As voir dire continued, she began to feel sick to her stomach. Her attorney asked that she be excused from the courtroom. The court inquired whether she was waiving her right to be present, to which her attorney responded "Yes, Your Honor. She says yes." Voir dire continued throughout the rest of the day with Celicia absent for at least part of it. That evening she went to Sinai Hospital for testing and was directed to go to the Krieger Eye Clinic the next morning. She attended

her eye appointment and did not come to court. The court again asked whether Celicia waived her right to be present. Her counsel responded that she was not pleased that she was missing voir dire, "so she revoked [his] authority to waive her presence." The court stopped the proceedings at that point until she returned.

Celicia contends that her statements through counsel did not effectively waive her right to be present. She relies on *United States v. Gordon* for the proposition that in order to waive presence, the defendant must make a personal, on-the-record statement. 829 F.2d 119, 125-26 (D.C. Cir. 1987). This misreads *Gordon*. Gordon was in custody outside of the courtroom. *Id.* at 121-22. Given his absence and the lack of an on-the-record waiver, the court could not determine whether his waiver was "knowing and voluntary." *Id.* at 126. The *Gordon* court was careful to distinguish defendants who are not in custody – that is, defendants like Celicia. *See id.* at 125 n.7. A non-custodial defendant may waive his right to be present by not showing up after the trial has begun. *See, e.g.*, *Crosby v. United States*, 506 U.S. 255, 259-61 (1993). Federal Rule of Criminal Procedure 43(c)(1)(A) says precisely that. Whatever the rule is prior to trial, we hold that when a defendant is in court during voir dire and her attorney states that she wishes to leave and that she is waiving her right to be present, that is an effective waiver regardless whether the defendant orally seconds her attorney's statement to the court.

III.

Benjamin finds error in the court's admission, over objection, of a portion of Troy Robinson's testimony. Celicia called Robinson to establish that witness vouchers bearing her name could have been distributed without her knowledge. The government sought to impeach Robinson on cross-examination.

Pursuant to Federal Rule of Evidence 609(a), the government questioned Robinson about his convictions for theft, federal program fraud, and wire fraud. Robinson pled guilty to a separate, but nearly identical, conspiracy involving voucher fraud with an attorney named Shola Ayeni. The government also sought to attack Robinson's credibility with other acts he had committed. *See* FED. R. EVID. 608(b). In response to the government's questions about his connection with fraudulent witness vouchers in the past, Robinson testified about engaging in those acts with Benjamin. The court overruled Benjamin's objection that this testimony did not go to Robinson's credibility.[1]

We have serious doubt whether testimony that Benjamin was involved in Troy Robinson's other acts concerned Robinson's own "character for truthfulness or untruthfulness" as required by Federal Rule of Evidence 608(b), but we need not decide the issue. Even if the district court erred in permitting the government to question Robinson about Benjamin's involvement, the error was harmless. *See* FED. R. CRIM. P. 52(a).

Two government witnesses, Antonio and Marvin Brown, stated that Benjamin was present with Robinson when they received witness vouchers. A third witness, Michael Taylor, testified that Benjamin was present with Robinson and Celicia

---

[1]Rule 103(a)(1) requires attorneys to state the specific ground of their objection unless it is apparent from the context. It was apparent here that Benjamin was claiming that Robinson's testimony about him did not go to Robinson's credibility, as Rule 608 required. In responding to Benjamin's objection, the court recognized the distinction between impeaching a witness under Rule 609 on the basis of a prior conviction and attacking a witness's credibility pursuant to Rule 608 on the basis of the witness's prior conduct.

when he received witness vouchers at Celicia's office. A fourth witness, Beatrice Pearson, testified that Benjamin accompanied Celicia when she signed out witness vouchers on several occasions. The government also introduced significant documentary evidence. Exhibit 9a indicated that Benjamin received 246 witness vouchers signed by Celicia from November of 1998 through January of 2001.[2] The total value of the vouchers amounted to $9,820. Exhibit 7a-1 was introduced as an example of a witness voucher signed by Celicia and turned in by Benjamin. The government compared Exhibit 7a-1 to Exhibit 29a – a time sheet from Benjamin's place of employment. The comparison of the two exhibits indicated that Benjamin was working during the time period he claimed to be appearing as a witness for Celicia's trial. The documentary and testimonial evidence suggests that Benjamin was an active participant with Celicia in passing out and cashing fraudulent witness vouchers.

Given this overwhelming evidence of Benjamin's participation in the fraudulent scheme, any error in the court's allowing the government to cross-examine Robinson about Benjamin's involvement could not have affected the outcome of the case.

## IV.

As to sentencing, Celicia argues that the district court erred in calculating a loss amount. After the jury returned a guilty verdict, the court instructed them to make a civil forfeiture determination pursuant to 18 U.S.C. § 981(a)(1)(C). The court told them that "the Government is entitled to . . . the value of the property that constitutes or is derived from proceeds traceable to

---

[2]By comparison, between October 1998 and early February 2001 the average attorney signed only 61 witness vouchers.

the violations." The jury returned a forfeiture verdict of $57,790 against Celicia. Celicia contended that the forfeiture verdict should control the court's loss determination under § 2B1.1 of the U.S. Sentencing Guidelines Manual. The court disagreed and independently calculated the loss amount to be $74,588.42. The effect of the court's finding was to raise Celicia's offense level by eight levels instead of six. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1) (2007).[3]

As Celicia sees it, the forfeiture verdict collaterally estopped the court from recalculating the loss amount at sentencing. We think not. For collateral estoppel to apply: "(1), the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case; (2), the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case; and (3), preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Martin v. DOJ*, 488 F.3d 446, 454 (D.C. Cir. 2007).

The "forfeiture and loss calculation[s] are distinct." *United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir. 2006). Forfeiture is a means of forcing a criminal defendant to disgorge ill-gotten profits. The theoretical limit of forfeiture is the value of the proceeds the defendant possesses from the illegal activity.[4] Loss regards the "reasonably foreseeable pecuniary harm that result[s] from the offense." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. (3)(A)(i) (2007). Loss

---

[3]The increase in the offense level raised the sentencing range from 27-33 months to 33-41 months.

[4]The concept of traceability applies here: if a defendant purchased a house with his share of the loot from a bank robbery, the house would be considered proceeds subject to forfeiture.

focuses on the harm the victim suffered, independent of what the defendant gained.  *Hamaker*, 455 F.3d at 1337.  Though the two calculations may at times yield the same outcome, they are not identical.

Here the court's forfeiture instruction, with its reference to "property that constitutes or is derived from proceeds traceable to the violations,"  was not entirely clear.  Celicia suggests that "proceeds" refers to everything taken from the government, regardless of who ultimately possessed it.  The government's statements to the jury support that view.  An equally plausible reading of "proceeds" is the value that Celicia personally received from her criminal activity.  One cannot be certain which concept, if either, the jury applied in determining the forfeiture verdict.  Given the difference between the two concepts, we cannot say that the issue of loss is the same issue decided by the jury when it considered forfeiture.  Collateral estoppel therefore does not apply.

As an alternative argument, Celicia claims that the court's determination of loss was unreasonable.  The court relied primarily on Government Exhibit 9a, which presented a list of 1,668 allegedly fraudulent witness vouchers.  The court took into consideration the corroborating documentary and testimonial[5] evidence when determining, by a preponderance of the evidence, that the vouchers listed on Exhibit 9a were overwhelmingly fraudulent.  The court's factual findings do not rest on any clear error.  18 U.S.C. § 3742(e).  The court

---

[5]The court relied on Antonio Brown, Marvin Brown, Michael Taylor and Troy Robinson.  Each of these witnesses established that this was a widespread conspiracy focusing on the family of Celicia and individuals living in the neighborhood around the 1700 block of Euclid Street.  The names listed on Exhibit 9a were individuals who were either family members or living in that neighborhood.

considered a wide variety of evidence all of which had "sufficient indicia of reliability to support its probable accuracy." *United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007).[6]

*Affirmed.*

---

[6]As we have said, the defendants' brief contains several additional arguments that do not merit discussion. We have considered these arguments and have rejected them.