Tywon M. HAGER and Devon Davis, Appellants,

v.

UNITED STATES, Appellee.

Nos. 09–CF–1405, 10–CF–67, 10–CF–65, 10–CF–66.

District of Columbia Court of Appeals.

Argued Feb. 13, 2013.

Decided Oct. 24, 2013.

Bruce A. Johnson, Jr., for appellant Hager.

Jenifer Wicks, Washington, DC, for appellant Davis.

Elizabeth Gabriel, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, John P. Mannarino, and Reagan M. Taylor, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and OBERLY, Associate Judges, and REID, Senior Judge.

OBERLY, Associate Judge:

Devon Davis and Tywon Hager were convicted of armed robbery,[1] assault with intent to commit robbery,[2] and possession of a firearm during a crime of violence ("PFCV")[3] in connection with an incident on the early morning of July 1, 2008. Davis was separately convicted of escape[4] and violating the Bail Reform Act ("BRA").[5] In addition to mounting a constitutional challenge to his exclusion from the voir dire process, Davis raises evidentiary challenges to his convictions for armed robbery, assault with intent to commit robbery, and PFCV. Davis does not separately challenge his escape and BRA convictions. We find no merit to Davis's evidentiary arguments. Because we find that the trial court committed reversible error by denying Davis his right of presence during voir dire, however, we reverse the judgment against him and remand his case for a new trial. Hager does not challenge the conduct of voir dire without his presence, but argues only that the trial court erred in admitting evidence of his pretrial identification by the complainants and that there was insufficient evidence presented at trial to support his convictions. As in Davis's case, we find Hager's evidentiary arguments without merit and affirm the judgment against him.

## I. Facts

### A. The Robbery

At approximately 1:30 on the morning of July 1, 2008, Jamar Harrison, his mother Rhonda Harrison, and two of his friends, Corey Sheppard and Charles Ford, were returning from a 7–Eleven and parking their car when they saw a black Mercedes Sport Utility Vehicle ("SUV") stop in the middle of the street in front of them. Three men jumped out of the SUV and approached them with guns as they got out of their car. After taking cash and cell phones from the victims, the three men

1. D.C.Code §§ 22–2801,–4502 (2012 Repl.).

2. D.C.Code §§ 22–401,–4502 (2012 Repl.).

3. D.C.Code § 22–4504(b) (2012 Repl.).

4. D.C.Code § 22–2601(a)(1) (2012 Repl.).

5. D.C.Code § 23–1327(a) (2012 Repl.).

returned to the SUV and drove away. The victims reported the robbery to police and gave descriptions of their attackers. The description of one of the attackers was of a heavily built black male with "long dreads" wearing a green shirt and blue jean shorts.

The police tracked Jamar Harrison's stolen cell phone to an alley where three or four black men were seen talking among themselves. Upon approach, the men ran from the police. In the alley, the police found a black Mercedes SUV and a second stolen cell phone that was determined to belong to Ford. Jamar Harrison's wallet was in the SUV. Appellant Davis's fingerprint was found on the phone in the alley. Shortly thereafter, three men generally matching the description of the robbers were spotted running along a fence line near the alley and into an apartment building. A police dog tracked human scent from the black Mercedes SUV in the alley to the same apartment building. Once inside the building, the dog led the police to an apartment where Davis's mother lived.

The police found Davis, Hager, and a third man in the bedroom of Davis's mother's apartment. Hager, a black male wearing his hair in long dreadlocks, was wearing blue jean shorts and a green t-shirt somehow wrapped around his body. A "man-sized" green shirt was later collected by police on a pile of clothes that contained no other "man-sized" clothing near the same bedroom. Jamar Harrison's cell phone was found on a dresser in the bedroom. When arrested, Hager was in possession of $801.

### B. The Pretrial Identifications

Later the same morning, Jamar Harrison, Sheppard, and Ford were separately shown photo arrays for both Hager and Davis. Sheppard was unable to make an identification of Hager. Jamar Harrison selected Hager's photo and said, "Maybe number 1, he looks like the driver." Ford also chose Hager's photo and stated, "This looks most like the dude with the dreads." When shown a photo array for Davis, Ford was unable to make an identification. Sheppard selected Davis's photo and said, "This face looks familiar." Harrison also picked Davis's photo and said, "Maybe number 3, it looks like the person who checked me."

At trial, both Hager and Davis moved to suppress the identifications on due process grounds. The trial court denied the motions, concluding that the circumstances of the identifications were not unconstitutionally suggestive. In court, none of the complainants identified Hager or Davis as their attackers. Jamar Harrison testified that he would recognize his robbers if he saw them again, but when asked if he saw any of them in the courtroom, he answered "No." On cross-examination, when asked why he picked Davis's picture from the array, Sheppard testified that he "picked the person because I was not sure ... the picture's, like, misleading. So it's different from seeing people face-to-face than the actual person." Sheppard further testified that he did not see any of the perpetrators in the courtroom. Ford testified on cross-examination that the person he picked in the photo array looked most like the robber with dreadlocks, but he was not sure that the robber was in the photo array at all. Ford denied seeing any of the robbers in the courtroom. The trial court permitted the government to introduce, over objection, the photo arrays and the pretrial identifications.

### C. The Cell Phones

#### 1. Ford's Cell Phone Found in the Alley

During trial, the government moved to admit Ford's stolen cell phone that had

been found in the alley near the SUV. The cell phone provided significant forensic evidence against Davis because his fingerprint was identified on the phone's glassy surface. The crime scene officer who collected Ford's phone testified that after processing the phone for fingerprints, she placed the phone in an evidence bag and submitted the fingerprint evidence to the Evidence Operation Center for analysis. The same crime scene officer authenticated the phone on the stand by recognizing her name and badge number on the sealed evidence bag that held the phone.

Ford could not specifically identify the phone as his when testifying. However, he stated that the phone in evidence was of the same type. Another police witness testified that he had matched the serial number on the phone with Ford's phone records in order to confirm that the phone belonged to Ford. Over several different types of objections, the trial court permitted the government to introduce Ford's cell phone and the accompanying fingerprint testimony.

### 2. Jamar Harrison's Cell Phone Found in the Bedroom

The government called the two police officers who had found Hagar, Davis, and a third man in the bedroom of Davis's mother's apartment. The first officer testified that he saw a cell phone on a dresser in the bedroom. The officer called the phone number that had been given to the officer by Jamar Harrison for his stolen phone. When the phone rang, the officer knew that he had found the right phone. A different officer collected the phone and authenticated it for evidentiary purposes at trial. The trial court admitted the cell phone and testimony about where it was found. Davis later filed a motion to strike this evidence which the trial court denied.

### D. Voir Dire

Prior to the beginning of voir dire, defense counsel for Davis and the trial court engaged in the following colloquy:

COUNSEL FOR DAVIS: Your Honor, I know it is not your practice, but I would ask that if we can pick the jury in the back, because otherwise it would get very crowded at the bench and I would like Mr. Davis to hear what goes on.

COURT: Well, I can arrange that through the use of headsets. I can arrange for headsets to be brought in so that Mr. Davis and, if necessary, Mr. Hager, can hear everything that goes on.

COUNSEL FOR DAVIS: I would rather be able to consult with him during it, but headsets is better than nothing.

COURT: All right, because if we have to go to the jury room it will slow us way down.

COUNSEL FOR DAVIS: And yet, we will be comfortable, but that's ok.

COURT: Not necessarily. Not necessarily. So we will order the headsets so that they will be available. You have the clothing for Mr. Davis and Mr. Hager?

The trial court conducted voir dire by asking a series of questions to the jury panel as a group. The court then called prospective jurors to the bench, as deemed necessary, to give their individualized answers. Any follow-up questions by the trial court and counsel were also asked and answered at the bench. Prior to the beginning of individual voir dire, the trial court ran a functionality test of the headsets. After it became clear that the headsets were not working properly, the court stated "They're not working at all? All right. Can we get started? We've called for the technician to come down." Without any perceivable break in

the proceedings, the trial court then began interviewing jurors. Five panel members were interviewed before the court checked to see if the headsets were working. At least once more during voir dire, Davis's defense counsel complained that the defendants were having trouble hearing the panel members. In all, voir dire was conducted on 71 jurors totaling 170 pages of transcript. All of it was conducted at the bench without the defendants.

## II. Discussion

## A. Davis's Appeal

### 1. Physical Presence at the Bench During Voir Dire

Super. Ct.Crim. R. '43(a) provides, in pertinent part: "The defendant shall be present at the arraignment, at the time of plea, [and] at every stage of the trial including the impaneling of the jury . . . ." A defendant's Rule 43(a) rights derive from his constitutional rights to be present at his own criminal proceedings under the Fifth and Sixth Amendments. *Kleinbart v. United States*, 553 A.2d 1236, 1239 (D.C. 1989). Indeed, we have held that "there is scarcely any right more fundamental to a criminal defendant than to be present in court while his trial is in progress." *Id.* (quoting *Miller v. United States*, 250 A.2d 573, 574 (D.C.1969)).

█ In *Robinson v. United States*, 448 A.2d 853, 855–56 (D.C.1982), we made it clear that this right included the right of the defendant to be present, upon request, at the bench as voir dire is proceeding. *See also Boone v. United States*, 483 A.2d 1135, 1137 (D.C.1984) ("we determined in *Robinson* that first hand observations of prospective jurors at the bench are to be permitted"). A defendant's presence at voir dire is so fundamental a right that it "cannot be overemphasized." *Id.*

█ Still, this right is not unlimited. *Briggs v. United States*, 525 A.2d 583, 589 (D.C.1987). To the extent that case-specific complications, such as security issues, make the defendant's presence at the bench during voir dire unreasonable, the trial judge has the discretion to use alternative methods to ensure that the defendant's rights are protected. *Id.* (identifying closed-circuit television and open court questioning as possible alternatives).

█ We have held that when a defendant fails to make a timely and adequate request for his or her presence at the bench where voir dire is being conducted, such a failure "constitutes a waiver of that right and forecloses the opportunity to be heard on appeal." *Lay v. United States*, 831 A.2d 1015, 1021 (D.C.2003) (quoting *Welch v. United States*, 466 A.2d 829, 839 (D.C.1983)). The question then is whether, in the course of her colloquy with the trial court prior to the beginning of voir dire, Davis's defense counsel sufficiently asserted Davis's request to be present at voir dire and preserved her objection to his exclusion during the proceedings. A similar colloquy in *Beard v. United States*, 535 A.2d 1373, 1375 (D.C.1988), is instructive.[6] In *Beard*, there was a somewhat ambiguous exchange between defense counsel and the trial court in which we concluded that the "trial judge clearly did not grant defense counsel's request for appellant's presence, but instead pointed out the mitigating feature of the different arrangement which was to prevail." *Id.*

---

6. In *Beard*, the exchange went as follows:
 DEFENSE COUNSEL: Your honor, I request that Mr. Beard be present for these conferences as well.
 COURT: Why?

 DEFENSE COUNSEL: So that he can assist me in voir dire during the case.
 COURT: You can go back at any time and tell him.

Here, we likewise conclude that the most appropriate interpretation of the exchange between Davis's counsel and the trial court was that it amounted to a denial of Davis's request. Defense counsel requested Davis's presence during voir dire and asked that voir dire be conducted "in the back" (which we take to mean in the jury room), as opposed to at the bench, so that defendant's presence could be accommodated. Although the request could have been more forcefully made, it was clear. Both sides of the remainder of the exchange contained ambiguities. The trial court's reply to Davis's request was ambiguous as to whether the court meant to deny Davis's request to be present, or merely to ask Davis's counsel to consider headsets as an alternative. Davis's counsel's response to the court's reply was ambiguous as to whether she was attempting to withdraw her original request prior to receiving an adverse ruling in favor of the headsets alternative, or simply acknowledging that she had lost the motion and was bowing to the inevitable.

In this situation, especially here because it was the judge who first gave the ambiguous reply, "it was his *responsibility* to determine whether [Davis] interpreted his comment as a denial or was intentionally relinquishing the right he had clearly asserted only seconds before." *Beard*, 535 A.2d at 1376 (emphasis added). However, the trial judge made no effort to assume this responsibility. He did not clarify the intent of his reply to Davis's request. Nor did he inquire into how Davis's defense counsel understood his reply, or whether Davis meant to withdraw his request for physical presence at voir dire. As in *Beard*, the burden was not on defense counsel "to press [her] point more strongly in the face of what [she may have] reasonably interpreted as a denial of [her] unequivocal request." *Id.* Consequentially, we believe it is appropriate to treat this case as one in which the trial court denied Davis's request for presence at voir dire and Davis's defense counsel preserved her objection to that denial.

Because we find that the objection was preserved, the proper standard of review is the constitutional harmless error standard. *Kleinbart*, 553 A.2d at 1239; *Beard*, 535 A.2d at 1376; *Boone*, 483 A.2d at 1140; *Robinson*, 448 A.2d at 856. If we find error, the burden "is on the government to show convincingly that the alleged prejudice was highly unlikely and that reversal on the grounds of such prejudice would be unreasonable." *Kleinbart*, 553 A.2d at 1240.

Our cases hold that the "quintessential elements of the right [to be present at voir dire] require that the defendant have the ability to hear and *to observe* jurors' responses." *Boone*, 483 A.2d at 1141 (emphasis added). It is obvious that a defendant must be able to hear the responses to questions being asked of jurors. It is equally important for a defendant to be able to see a juror's demeanor in order to assess whether he or she should be challenged for cause or peremptorily. *Cf. In re Temple*, 629 A.2d 1203, 1208–09 (D.C. 1993) (discussing the critical nature of first-hand observations of witnesses in the courtroom in order to judge their demeanor and evaluate their credibility). "No matter how extensive or involved were prior discussions with his lawyer, what may be irrelevant when heard or *seen* by his lawyer may tap a memory or association of the defendant's which in turn may be of use to his defense." *Boone*, 483 A.2d at 1137–38 (emphasis added).

 It is thus clear from our case law that the right extends not only to the defendant's ability to hear the responses that jurors give, but also to reasonably view their demeanor during those respons-

es in order to assess their various qualities as jurors and make decisions about whether to exercise challenges. Otherwise, the defendant's right to "observe" voir dire would be rendered meaningless.

█ Here, the record is thin on the matter of exactly what Davis could see from his vantage point during the voir dire proceedings. However, government counsel conceded at oral argument that, at best, it was "possible" that Davis might have been able to glance at the sides of the jurors' faces during questioning by the trial court, and perhaps see them head-on during their return walk from the bench *after* questioning was complete. Therefore, it is reasonable for us to assume that from Davis's position while sitting at counsel table the jurors were turned away from him and his primary view during voir dire would have been of their backs.

Furthermore, there were no extenuating circumstances that justified departure from the "normal cases ... [where] the balance dictates that the defendant upon request should be allowed to observe and hear juror responses made at the bench." *Briggs v. United States*, 525 A.2d 583, 589 (D.C.1987) (quoting *United States v. Washington*, 705 F.2d 489, 497 (D.C.Cir.

1983) (per curiam)). There was no indication of a security or other major problem attendant to conducting voir dire "in the back," i.e., in the jury room. The trial court conducted no substantive analysis of its decision and gave almost no articulation of its reasons for the denial.[7] *Cf. Briggs*, 525 A.2d at 589–90 (substantial evidence of mental illness of defendant in custody gave the court a reasonable basis to believe that his physical presence at the bench during voir dire would be unsafe).

█ Therefore, it was error to conduct voir dire in such a way as to preclude Davis from observing his jurors during their questioning. In light of this error, the burden falls on the government to demonstrate harmlessness beyond a reasonable doubt.

In assessing harmlessness in this context, our cases instruct that the analysis is focused on the degree to which, despite the error, the defendant was able to meaningfully participate in voir dire.[8] *Kleinbart*, 553 A.2d at 1240 n. 6 (citing cases in which a harmlessness analysis was performed). Specifically, the question has generally turned on how much of the voir dire the defendant was excluded unconstitutionally

---

7. The trial court's perfunctory statement that conducting voir dire "in the back" "would slow us way down" is far too conclusory to justify the disregard of Davis's constitutional rights.

8. *Boone* makes brief reference to the strength of the government's case in the context of assessing harmlessness. 483 A.2d at 1140. We think, in accordance with the weight of our case law in this area, that the best view of whether the error was harmless looks at the degree to which the error impacted the defendant's ability to meaningfully participate in the voir dire. We prefer this approach to speculation as to whether other jurors who might have sat on the case had the defendant been afforded his constitutional rights would have viewed the evidence in the same way that the jurors did at trial. We also think that

the correct analysis does not focus on the significance of the jurors' answers. *Cf. Lay*, 831 A.2d at 1023 (observing in dicta that the defendant's presence at voir dire probably would not have changed "the outcome" because of the uncontroversial nature of the jurors' responses). If a juror gives a controversial answer, it is likely that the defense attorney will be able to challenge the juror without the need for assistance from the defendant. It is the opposite situation, where the juror seems uncontroversial, but where the defendant desires to exercise his right "to express an arbitrary preference," in which the defendant's presence is needed most greatly. *Boone*, 483 A.2d at 1138 (quoting *Frazier v. United States*, 335 U.S. 497, 506, 69 S.Ct. 201, 93 L.Ed. 187 (1948)).

from hearing and observing. *Robinson,* 448 A.2d at 856 (error not harmless where defendant excluded from "the bulk" of voir dire); *Young v. United States,* 478 A.2d 287, 290 (D.C.1984) (error harmless where "appellant had an opportunity to hear and observe the *voir dire* of a majority of the jurors"). In cases such as *Kleinbart, Beard, Boone,* and *Robinson,* where the defendant was excluded from all or the majority of voir dire, the government has struggled to show harmlessness. The government attempts to distinguish those cases by arguing that the use of headsets mitigated the situation by at least providing Davis with the ability to hear the voir dire process. However, this claim is undermined by the murkiness of the record as to the functionality of the headsets.

Despite the fact that the trial court knew there was a problem with the headsets, the court did not regularly, or even irregularly, check on whether they were working. Therefore, we can give little weight to the argument that the headsets offset Davis's inability to observe voir dire, because we cannot be sure of the degree to which he could actually hear the jurors' responses. We know that Davis was denied the ability reasonably to observe his jurors. It appears that this error was compounded by the deprivation, at least in part, of his ability to hear his jurors.

The government points to *United States v. Hoover–Hankerson,* 511 F.3d 164, 169 (D.C.Cir.2007), as persuasive authority that the use of headsets satisfied Davis's constitutional and Rule 43(a) rights. In *Hoover–Hankerson,* the D.C. Circuit found that the defendant's use of headsets while voir dire was conducted at the bench was sufficient to meet his right of presence. However, we find *Hoover–Hankerson* easily distinguishable. First, *Hoover–Hankerson* is a plain error case because no objection was made at trial. *Id.* Second, we

know the headsets in *Hoover–Hankerson* clearly worked, because the trial court "confirmed that the headset was operating and that [the defendant] could hear what was said." *Id.* Third, unlike this case, there was opportunity for the defendant in *Hoover–Hankerson* to engage in conversations with her attorney throughout the voir dire process. *Id.* Finally, in contrast to the situation here, there appears to have been no concession from the government in *Hoover–Hankerson* that the layout of the courtroom was such that the defendant was deprived of her right to see and observe the questioning and demeanor of the jurors. Consequentially, we believe that *Hoover–Hankerson* provides little relief to the government.

█ In sum, we find that the facts of this case place it far more in line with our cases holding that the government failed to meet its burden to establish harmlessness beyond a reasonable doubt. In doing so, we are mindful that "the constitutional right of an accused to be present at trial is so precious a national heritage that it can only be waived or outweighed by misconduct so grave on the part of the accused that it threatens the endurance of the heritage itself." *Kleinbart,* 553 A.2d at 1241 (citing *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). Consistent with that principle, the denial of Davis's right to observe his jurors constituted reversible error entitling him to a new trial.

### 2. Davis's Evidentiary Arguments

█ Davis's evidentiary claims are less convincing, and we address them only briefly to provide guidance should it be needed for a retrial. First, the victims' pretrial identifications of Davis were sufficiently reliable so as to be admissible. *Redmond v. United States,* 829 A.2d 229, 235 (D.C.2003) ("We have recognized the

theoretical possibility that an identification could be so unreliable as to be bereft of any probative value, but have stressed that such situations would be rare indeed."). There is no threshold amount of certainty that a pretrial identification must meet for admissibility. "Suppression of identification testimony because it is deemed too weak is not proper. That is the function of a timely judgment of acquittal." *United States v. Hunter*, 692 A.2d 1370, 1376 (D.C.1997) (quoting *Brown v. United States*, 349 A.2d 467, 468 (D.C.1975)).

 The fact that the identifications were not accompanied by absolute confidence goes to weight, not admissibility. *Paris v. United States*, 515 A.2d 199, 205 (D.C.1986) ("Although [the witness] did not say he was absolutely certain that the photos he picked out were of the two men he saw in the alley, he did confirm that they looked 'something' like' them. Often this is the best one can hope for in a photographic identification; it certainly is enough to make [the] identifications admissible ...."); *cf. In re L.D.O.*, 400 A.2d 1055, 1057 (D.C.1979) (witness completely disavowed pretrial identification causing it to be inadmissible). Furthermore, a pretrial identification is admissible even if the witness does not make an in-court identification. *Beatty v. United States*, 544 A.2d 699, 702 (D.C.1988). It is easily understandable that a pretrial identification made shortly after an event might be more reliable than an in-court identification made much later in time. *L.D.O.*, 400 A.2d at 1057 ("The extra-judicial identification typically occurs quite soon after the crime when the witness' memory is fresher and less likely to have been led afield by incidental events.").

 Second, Ford's phone was properly admitted into evidence. Davis principally complains that there were two inconsistencies in the police investigation regarding Ford's phone: One, the crime scene officer who collected the phone from the alley acknowledged during her testimony that the glassy surface part of the phone was broken when she opened the sealed evidence bag. However, she did not recall that the phone's surface was broken when collected. Two, the crime scene officer wrote in her report that the cell phone was without a known serial number. This conflicted somewhat with the testimony of one of the other police officers who stated that he used the serial number on Ford's phone to track down Ford's records and confirm that the phone was his. Neither of these issues rendered the evidence inadmissible. Certainly, the trial court did not abuse its "broad discretion in determining the admissibility of physical evidence" by satisfying itself that "in reasonable probability the article has not been changed in important aspects." *Gilmore v. United States*, 742 A.2d 862, 871 (D.C.1999). To the extent that either of these issues represented a "gap" in the chain of custody, it merely went to the weight of the evidence. *In re D.S.*, 747 A.2d 1182, 1187 (D.C.2000).

 Finally, Jamar Harrison's phone was also properly admitted, even though only circumstantial evidence linked the phone to Davis. Davis's argument that the government must have direct evidence of exclusive or constructive possession of the phone in order for it to be admissible is without merit. We agree with the government that Jamar Harrison's cell phone that was found in the bedroom where Davis was hiding served the obvious function of connecting Davis to the robbery. Therefore, it was relevant for evidentiary purposes. It was for the fact-finder to determine the amount of weight that such a connection was to be given. We find no

abuse of discretion by the trial court in admitting Jamar Harrison's phone.

### B. Hager's Case

We need address Hager's claims only briefly. Despite several opportunities to do so, Hager did not challenge at any time, either during trial or on appeal, his absence from the bench during voir dire. And as we ruled with respect to Davis's evidentiary challenges, there was no defect in the process used to identify Hager. Certainly, the photo array from which the complainants identified him as one of their attackers was not "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *United States v. Brown,* 700 A.2d 760, 761 (D.C. 1997) (quoting *Turner v. United States,* 622 A.2d 667, 672 n. 4 (D.C.1993)). As in Davis's case, Hager's evidentiary claims about the uncertainty of the pretrial identifications go to weight, not admissibility. *Redmond,* 829 A.2d at 235. Moreover, even accounting for any identification weaknesses that existed in the government's case, there was more than sufficient evidence upon which a reasonable jury could have found Hager's guilt, especially when viewing the evidence in the light most favorable to the government. *Gibson v. United States,* 792 A.2d 1059, 1065 (D.C. 2002).

### III. Conclusion

For the foregoing reasons, we reverse the judgment in Davis's case and remand for further proceedings consistent with this opinion. We affirm the judgment of conviction against Hager.

*So ordered.*