# United States Court of Appeals
## For the First Circuit

Nos. 13-2262 & 13-2328

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES PRANGE and JOHN C. JORDAN,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel Gorton, U.S. District Judge]

Before
Kayatta, Baldock,* and Selya,
Circuit Judges.

Steven N. Fuller, with whom Allen-Fuller, P.A. was on brief, for appellant James Prange.

Inga L. Parsons for appellant John C. Jordan.

David M. Lieberman, Attorney, United States Department of Justice, with whom Carmen M. Ortiz, United States Attorney, Stephen E. Frank, Assistant United States Attorney, Sarah E. Walters, Assistant United States Attorney, Leslie R. Caldwell, Assistant Attorney General, and David M. Bitkower, Deputy Assistant Attorney General, were on brief, for appellee.

November 5, 2014

_____

*Of the Tenth Circuit, sitting by designation.

**Baldock, <u>Circuit Judge</u>**. A jury convicted Co-Defendants James Prange and John Jordan of multiple fraud-related counts based on their participation in an FBI securities fraud "sting." The district court sentenced each defendant to 30 months in prison. Defendants' consolidated appeals raise multiple challenges to their convictions and sentences. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm Defendants' convictions but remand for resentencing because the district court procedurally erred when formulating their guideline sentencing ranges.

## I. Introduction

Penny stocks are stocks issued by small companies that trade at less than $5 per share. These stocks, generally speaking, are thinly traded and not listed on organized securities exchanges. As a result, their prices are often volatile and subject to manipulation.

To investigate fraud in the penny stock market, the FBI launched "Operation Penny Pincher." This sting operation posed an FBI agent as a corrupt hedge fund manager named "John Kelly" from a fictitious fund called "Seafin Capital." In this role, the agent proposed a particular investment deal to the executives of companies with low market capitalization. The agent offered to use up to five million dollars of his clients' money to overpay for restricted shares of the executives' companies in return for a

fifty percent kickback disguised as a consulting fee to one of the agent's nominee companies.[1]

The FBI created a New York address, website, and business cards, and rented a Massachusetts office for Seafin Capital. It also used former stock broker E.H. as a cooperating witness willing to speak to executives interested in the kickback arrangement. E.H. had previously been convicted of wire fraud through this same operation and was seeking a lenient sentence.

## A. Defendant Prange

Defendant Prange is a self-described financial consultant. A mutual acquaintance introduced E.H. and Prange over the phone in early 2011. In June 2011, Prange called E.H. asking for details about the kickback program. E.H. explained the program as a "program of last resort" where fifty percent would go right back to the agent-manager "and basically it's a kickback to him." E.H. also emphasized that the executives had to "fully understand the program" and that those who were uncomfortable could "just walk away." When Prange asked whether the manager had "a little one page term sheet" documenting the kickback arrangement, E.H. responded "no, no . . . he would never put anything in writing." Prange then replied "Exactly. Right."

---

[1] "Restricted" shares generally refer to unregistered and non-transferable shares of ownership in a corporation. They typically carry less value because the owner's right to sell or transfer the stock is limited.

Prange recommended a number of executives as participants in this scheme and later participated in conference calls where E.H. explained to these executives that the hedge fund did not know about the kickback because the manager "slip[ped] this money in" with his "legitimate business" deals. He also explained that the manager used "seven or eight different nominee names" to receive the consulting fee even though there was "no consulting work being done for the company." With Prange on the call, E.H. told one of these executives that the arrangement was "inappropriate . . . definitely inappropriate . . . in my mind illegal."

Prange met the undercover agent in Massachusetts on July 22, 2011. The agent explained that his fund's typical investments involved a great deal of due diligence. But alongside these "legitimate deals," the agent said he invested in longshot corporations in a way that made it look like he had done due diligence when, instead, he would simply "paper the file in order to get it through, and have the hedge fund, make the capital investment." The catch? He took "a fifty percent kickback, right off the top." The agent then offered Prange a choice: "if at the end of today . . . there's something about me you don't like, then, we decide to part ways." But if Prange decided to participate he would receive ten percent of each kickback, "so if . . . we do five million, I get two and a half, I can give you ten percent."

The agent then explained logistics. He would fund the companies "in tranches . . . just to make sure all the mechanics . . . work out." Each tranche would "overpay" for restricted shares of the company's stock. As for the kickback, the agent explained, "it's me, personally, and through my nominee company, that gets the money . . . so the fund doesn't know, they don't need to know." To "mask the payment," the agent would "execute a consulting agreement" with one of his nominee companies, but he made clear that "[the] consulting agreement . . . is in paper only, there's no consulting." The agent then told Prange "the ball is in your court . . . if you wanna continue these meetings." Prange responded, "[a]bsolutely . . . it's excellent." Prange then sat through two meetings where the agent repeated the kickback pitch to two of the executives Prange had recommended for participation in the scheme.

**B. Defendant Jordan**

Several weeks later, Defendant Prange suggested the undercover agent invest in Vida Life International. On August 22, 2011, the agent met with Prange and Defendant Jordan--Vida Life's president, CEO, and CFO. The agent had a two-hour, face-to-face conversation with Jordan, during which he explained the kickback scheme. He then told Jordan "the decision now is yours whether you want . . . to continue." Jordan asked if Vida Life would need to report the kickback on "a 1099" tax form; the agent said no,

because they would "mask[ the] payment through a consulting agreement" even though no one would ever perform any consulting. The agent then told Jordan, "my biggest concern . . . is your ability to . . . feel comfortable and . . . cover or hide the payment that you're making back to me." Jordan responded, "I have no issues." The agent also told Jordan, "I'm screwing my investors on the hedge fund side," but qualified that, "They have done so well in the past that anything I do like this is . . . not gonna really hurt them." He then asked if Jordan "had any pangs . . . of consc[ience] with that." Jordan responded simply: "No." Jordan then gave the agent materials the agent could use to "mislead" his partners on the nature of the investment. Jordan also pledged to make Vida Life's press releases say the cash was coming from the sale of fishmeal, and not from Seafin.

At the close of the meeting, Jordan proposed they sign the consulting and stock subscription agreements right then and there. The agent signed the consulting agreement, but directed Jordan (who lived in California) to take the subscription agreement home with him, fill in certain information, and then send it back. By August 31, 2011, Jordan had finalized these agreements.

Once the executives finalized the stock purchase agreements and the consulting agreements, which listed "Waters Edge" as the nominee corporation to receive the kickback, the FBI (posing as Seafin) wired the first tranche of approximately $30,000

to each company.  Of the $32,000 Vida Life received, it sent $16,000 to Waters Edge.  Vida Life then disbursed the remainder to Jordan, his credit card, his niece, his attorney, and his business partner.  In anticipation of the next tranche, Jordan fabricated an invoice, dated September 8, 2011, justifying a $50,000 payment by Vida Life to Waters Edge for purported consulting services, technology assessments, travel expenses, and conference fees.  Neither Waters Edge nor the agent ever provided these services.

The FBI stopped the investments in September 2011, adopting a cover story that Seafin had transferred John Kelly to its London office where he could no longer execute these fraudulent investments.  The FBI arrested Prange, Jordan, and the other participants several months later.  The three other executives indicted with Prange and Jordan--Stephen Berman, Richard Kranitz, and Karen Person--pled guilty.  Prange and Jordan went to trial.

**C.  Trial**

At trial, the government during its case in chief played in short segments video recordings of the agent's meetings and phone conversations with Prange, his meeting with Jordan, and his meetings with the other executives.  After playing each segment, the government asked the agent to clarify particular statements made during these conversations.  For example, after playing a clip where Prange asked the agent whether he would have "an open line of communication" to "[b]ring other things to you," the agent

testified that he understood Prange's question to be referencing Prange's "ability and willingness to bring other companies to do these stock fraud deals." As to Jordan, after playing the clip where the agent asked Jordan if he was comfortable hiding the kickback and Jordan responded "I have no issues," the government asked the agent what he thought Jordan's response meant. The agent answered: "It's my understanding that Mr. Jordan was clear that this was an illegal stock deal and he was willing to participate in it." Similarly, when asked why he told Jordan "I'm screwing my investors on the hedge fund side," the agent testified that this was so he could "make clear to Mr. Jordan that this is not a legitimate transaction." After playing the segment where the agent asked Jordan if he had any "pangs of consc[ience]" about what they were doing and Jordan responded "no," the agent testified his understanding from this response was that "Mr. Jordan had no problem with what I was doing by screwing my investors." Prange did not object to this line of questioning at trial. Jordan's repeated objections were, for the most part, overruled.

In their defense, Prange and Jordan claimed entrapment throughout trial and sought judgments of acquittal on this basis. The district court denied these motions, but instructed the jury on the defense of entrapment. The court told the jury that, to convict, "[it] must be convinced that the government has proven beyond a reasonable doubt that [the] defendant was not entrapped."

The government could satisfy its burden in one of two ways, the court explained: It might demonstrate "that the cooperating witness or undercover agent did not persuade or talk the defendant into committing the crime." Alternatively, the government could establish "that the defendant . . . was ready and willing to commit the crime without any persuasion from the cooperating witness, undercover agent or any other government agent."

At the close of trial, the district court notified the parties that it planned to provide a copy of the superseding indictment to the jury but would redact the names of the three other executives who had pled guilty. The court refused, however, "to take out all of the references to the co-conspirators." Defendants objected. They urged the court to redact the superseding indictment's "Introduction" and "Background" sections because these sections contained "numerous representations including acts by individuals who are not on trial which are prejudicial." Defendants also complained that the indictment referenced the term "nominee companies" in quotations when referring to the agent's nominee companies. The court overruled these objections and submitted the indictment to the jury. But it also instructed the jury "[n]ot . . . to be concerned with the guilt of any other person or persons not on trial as a defendant in this case," and explained that "an Indictment is not evidence of any kind against the defendant."

Ultimately, the jury convicted both Defendants on all counts: Prange with three counts of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349; and eight counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1349, and 2; and Jordan with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349; four counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1349, and 2; and one count of mail fraud, in violation of 18 U.S.C. §§ 1341, 1349, and 2. Prange and Jordan then moved for judgment notwithstanding the verdict or, in the alternative, a new trial arguing that "no reasonable jury could find beyond a reasonable doubt that the government had disproven the defense[] of . . . entrapment . . . ." The district court denied these motions.

**D. Sentencing**

In preparation for sentencing, Jordan's Presentence Report ("PSR") recommended holding him accountable for $32,000 in intended loss, representing the full amount of the money transmitted to Vida Life. Prange's PSR recommended holding him responsible for $95,000, reflecting the sum total of the funds transmitted to Vida Life and the two other companies whose executives Prange had introduced to the agent. Defendants urged the district court to reduce these loss calculations by the market value of the stock purchased by Seafin and to classify the kickbacks as credits against the loss. The district court rejected

these arguments and accepted the PSRs' recommended figures.  Based on these numbers, Jordan received a six-level increase to his base offense level and Prange received an eight-level increase.

The PSR also concluded Jordan had altered an e-mail before producing it to the government and accordingly recommended a two-level obstruction-of-justice enhancement to Jordan's offense level.  More specifically, in response to a government subpoena, Jordan initially produced an e-mail to his lawyer, Richard Kranitz--who, recall, pled guilty to other charges related to this sting--referencing the fraudulent consulting fees as follows:

> I have to request that restricted stock be issued to SEA FIN CAPITAL LLC as agreed.  Both the issuance of stock and paying for the "consulting" fees were approved by the Board of Directors on August 26, 2011.

Although the e-mail referenced two attachments, Jordan did not include them.  After being notified of the missing attachments, Jordan produced them along with another version of the e-mail above, with the same date and time stamp (August 31, 2011, 8:53 a.m.).  But in this second e-mail, the word "consulting" was no longer in quotation marks.  Over Jordan's objection, the court adopted the PSR's conclusion that deleting these quotation marks warranted an obstruction-of-justice enhancement.

The government also argued Prange deserved a four-level enhancement under U.S.S.G. § 3B1.1(a) because he organized or led five or more participants.  The PSR did not recommend any leadership or management enhancement.  The court declined the

government's request, but ultimately found "that [Prange] was at least a manager and supervisor or exercised management responsibilities over the property, assets or activities of a criminal organization." As such, the court applied a two-level enhancement to Prange's offense level under § 3B1.1(c).

The district court eventually calculated Prange's guideline sentencing range at 24 to 30 months, reflecting an offense level of 17 and a criminal history category of I. The district court calculated Jordan's guideline sentencing range at 30 to 37 months, reflecting an offense level of 19 and a criminal history category of I. The court sentenced both Defendants to concurrent terms of 30 months' imprisonment for each count of conviction.

## II. Agent Testimony

### A. Testimony Against Jordan

Jordan first argues the district court erred when it permitted the undercover agent to interpret what he and Jordan meant by certain questions and statements in their recorded, face-to-face conversation. Jordan preserved his objections to the agent's testimony at trial so we review these evidentiary rulings for an abuse of discretion. See United States v. Albertelli, 687 F.3d 439, 445 (1st Cir. 2012). "But abuse of discretion is not a monolithic standard. Within its margins, embedded issues may receive attention under more narrowly focused standards. Thus,

embedded questions of law engender de novo review and embedded findings of fact engender clear-error review." United States v. Carrasco-De-Jesús, 589 F.3d 22, 26-27 (1st Cir. 2009).

Jordan argues the agent impermissibly testified as to (1) the agent's own state of mind and intent, (2) Jordan's state of mind and intent, and (3) the ultimate legal issue in the case. He gives a number of examples of this purportedly improper testimony:

| Recorded Conversation | Agent's Testimony |
|---|---|
| Jordan: "Do we as a corporation have to issue a 1099?"<br><br>Agent: "No"<br><br>Jordan: "How do we go around that?" | "It's my understanding that [Jordan]'s engaging me now on how best to cover up the kickback payment." |
| Jordan: "If [other participating companies] have done well and their audits go through then I'm sure ours . . . will do the same." | "I understand Jordan to be telling me that the consulting agreement--phony consulting agreement and the fake invoices, if they passed audits from companies that have already done these stock deal--frauds with, then he thinks that it will pass his as well." |
| Agent: "my biggest concern . . . is your ability to . . . feel comfortable and . . . cover or hide the payment that you're making back to me."<br><br>Jordan: "I have no issues." | "It's my understanding that Mr. Jordan was clear that this was an illegal stock deal and he was willing to participate." |
| Agent: "I'm screwing my investors on the hedge fund side."<br>. . .<br>"So if you have any pangs of con[science] with that."<br><br>Jordan: "No." | "This is another . . . way I can make clear to Mr. Jordan that this is not a legitimate transaction."<br><br>"I understand Mr. Jordan had no problem with what I was doing by screwing my investors." |

Our first task is to establish whether the government offered this testimony as expert testimony or lay testimony. When critical evidence in a case consists of recorded conversations,

"officers commonly help interpret [these] conversations by translating jargon common among criminals." Albertelli, 687 F.3d at 446. "This [testimony] can be admitted as lay testimony from experienced officers, expert testimony or both depending on circumstances." United States v. Santiago, 566 F.3d 65, 69 (1st Cir. 2009). Where the basis of an interpretation comes from the officer's personal involvement in the case, rather than from specialized outside knowledge, we typically construe it as lay testimony under Federal Rule of Evidence 701. See Albertelli, 687 F.3d at 446–47.

Jordan's opening brief sometimes assumes the agent's testimony was lay testimony. See Jordan Br. at 25 ("Even if the agent was being used as some type of expert . . . ." (emphasis added)). Other times it assumes the testimony was expert testimony. See id. at 31 (asserting the agent's testimony violated Fed. R. Evid. 704, which applies only to expert witnesses). Not until his reply brief does Jordan assert that the agent's interpretations should be classified as expert testimony because the agent had also testified about "industry terms." Jordan Reply Br. at 1. "While a reply brief is not the proper place to raise new arguments, it is proper for a court to look there for clarification." United States v. Bradstreet, 207 F.3d 76, 80 n.1 (1st Cir. 2000) (citation omitted). Regardless, the fact that this case involved some industry jargon does not automatically turn the

-15-

agent's interpretations of his own conversations with Defendants into expert testimony.

Indeed, the agent prefaced almost every interpretation he gave with "I understand this to mean," or "it is my understanding that . . . ." The agent never once said, for example, "Jordan said X and, in the finance industry, that means Y." Furthermore, as to the jargon used, the agent used terms like "lender of last resort" to try to convey the illegality of these transactions to both Defendants. But when pressed on the meaning of these particular terms, the agent readily admitted he did not know and did not look up their meaning "in the business community." Rather, the agent based his understanding of Defendants' responses to terms like "lender of last resort" on his personal understanding of that term "[i]n the context of this undercover operation." (emphasis added). As such, we fail to see why we should treat the agent's interpretation of his own conversations as expert testimony. "Although linguistically possible, calling such testimony 'expert opinion' would lend undue credibility to it and increase the risk of reliance on information not properly before the jury as data on which 'experts in the particular field would reasonably rely,' [when] the 'field' is merely the facts of the case." Albertelli, 687 F.3d at 446 (quoting Fed. R. Evid. 703); see also United States v. Rollins, 544 F.3d 820, 833 (7th Cir. 2008) (Where "the agent's 'impressions' testimony was based on his own personal observations

-16-

and perceptions derived from this particular case[, s]uch testimony is admissible as lay opinion testimony.").

Of course, we have previously detailed many potential dangers of allowing this form of interpretation as lay testimony. See Albertelli, 687 F.3d at 447. And Jordan, in a conclusory list in his reply brief, asserts every one of these dangers were harmfully manifested at trial. Again, the reply brief is not the proper place to raise these new arguments. See Bradstreet, 207 F.3d at 80 n.1. Moreover, Jordan only hints at developed argument as to two of these dangers. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

First, Jordan essentially argues that we cannot treat the agent's testimony as admissible lay testimony because the government failed to lay the necessary foundation for lay testimony. See Albertelli, 687 F.3d at 447. The Federal Rules of Evidence require that lay testimony be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Alluding to Rule 701(a), Jordan argues the agent was "unable to point to any rational basis for the interpretation

offered [and did] nothing more than speculating." Albertelli, 687 F.3d at 447.  Jordan relies heavily on two Second Circuit cases to argue this foundational element was not met, at least as to the agent's testimony interpreting what Jordan meant by his statements and responses during their recorded conversation.  Most significantly, he cites United States v. Garcia, 291 F.3d 127 (2d Cir. 2002), for the proposition that "[w]hen a conversation has a legitimate purpose understandable to a lay person, testimony about a code without some evidence of prearrangement or some other foundation is inappropriate."  Id. at 141; see also United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992)("When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . .").

We fail to see how statements such as "screwing my investors on the hedgefund side" could lend themselves to a legitimate purpose understandable to a lay person.  Moreover, the government laid out an objective basis for the agent's understanding that Jordan knew they were speaking in coded terms and his impression of what Jordan actually meant.[2]  Specifically, the agent testified that stock fraud deals are "discussed

_____

[2] Clearly, the agent had personal knowledge of what he meant when he spoke to Jordan, and "his status as a participant in the conversation is sufficient to demonstrate the basis of this opinion." Garcia, 291 F.3d at 140-41.

-18-

privately," "happen quickly," and employ "coded terminology."[3] Furthermore, before meeting with Jordan personally, the agent asked Prange, who had recruited Jordan into this scheme, about Jordan's understanding of the scheme. Prange told the agent that Jordan's "money guy" had explained to Jordan that they had tried "different ways" to get financing and that "this deal makes sense." Prange also told the agent, Jordan "gets it." The agent then pressed Prange: "All right. And he's good with the kickback with the 50 percent?" To which Prange responded "yes." The government thus provided an objective basis for the agent's opinion that Jordan met with him personally to discuss participating in an illegal stock fraud scheme.

Jordan then asserts the government did not establish a foundation for how this lay testimony was helpful to the jury. See

---

[3] To be sure, the Second Circuit has condemned, and we have strongly cautioned against, a witness using "broad appeals to 'the totality of the investigation'" or "purporting to represent collective knowledge" "for the bases of his interpretations." Albertelli, 687 F.3d at 448 (quoting United States v. Grinage, 390 F.3d 746, 749 (2d Cir. 2004)). And here, the agent relied on his specialized expertise and "experience investigating frauds like this" in explaining how stock fraud deals typically work and why interpretation was needed. But Jordan does not point to, and we have not found, any place in the record that indicates the agent purported to base his interpretations of Jordan's specific statements on collective knowledge. Rather, as explained above, the agent readily admitted on cross-examination that his understanding of certain terms might not line up with their traditional meaning in the business community. Furthermore, unlike in Grinage, where the agent never made any personal observations of the defendant, see 390 F.3d at 749, here, the agent interpreted his own face-to-face conversation with Jordan.

Fed. R. Evid. 701(b). Rather, Jordan claims, his conversation with the agent used everyday terms that made sense contextually. We disagree. Jordan often used abrupt stand alone words or phrases that do not strike us as everyday terms, for example: "what will be your overpay," and "[f]or five, half back." Likewise, without proper context, a lay jury might easily fail to grasp the significance of many of Jordan's comments. For example, at one point in their conversation, the agent explained to Jordan that his hedge fund had "CalPERS" and "other pension money from California," and also that he was "screwing" his investors on the hedge fund side. Jordan then responded simply, "my wife . . . doesn't work with the state[,] so." Those familiar with public company auditing and state retirement systems might grasp the significance of Jordan's response without any further explanation, but a lay juror might not. The agent's own statements at the meetings were often equally obscure.[4] True, Jordan--the President, CEO, and CFO of a public company--never expressed any confusion with the vernacular the agent used or its significance, but we understand how a lay juror might. The agent's testimony therefore helped the jury clearly understand the recorded conversation and its significance.

---

[4] For example, the agent told Jordan, "I view you differently and take that as a compliment . . . I see you as having, uh, access . . . either to venture capital money or to government money." Furthermore, in trying to convey the illegality of the scheme to Jordan, the agent used terms like "last resort," "kickback," and "papering the file."

Finally, the agent's testimony was "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Jordan does not argue otherwise. As we noted above, although the agent referenced his specialized expertise in explaining that stock fraud deals are often planned in a coded language, Jordan does not point to any place in the record where the agent relied on prior specialized knowledge to interpret the particular terms used in his conversation with Jordan. Rather, the agent's interpretations appear to be based on his own personal understanding of what Jordan meant, developed in the context of face-to-face conversation. See Rollins, 544 F.3d at 832 (admitting agent's lay testimony about code words when "not based on any specialized knowledge gained from his law enforcement training and experience," but instead on "the particular things he perceived from monitoring intercepted calls" and other case-specific investigative activities). We are therefore satisfied that the government laid a sufficient foundation for the agent's lay testimony interpreting his face-to-face conversation with Jordan.

The second danger Jordan alludes to is that the agent "usurp[ed] the jury's function by effectively testifying as to guilt rather than merely providing building blocks for the jury to draw its own conclusion." Albertelli, 687 F.3d at 447. In this vein, Jordan points out that the agent repeatedly testified as to

Jordan's knowledge of the illegality of this scheme. But Jordan does not explain how this usurped the jury's function. Instead, he relies on an unpublished district court memorandum and order for the proposition that "[a]n expert witness may not testify as to another person's intent. No level of experience or expertise will make an expert witness a mind-reader." Holmes Grp., Inc. v. RPS Products, Inc., CIV.A. 03-40146-FDS, 2010 WL 7867756, at *5 (D. Mass. June 25, 2010) (emphasis added). Yet Jordan fails to acknowledge that a lay witness may "offer an opinion that is 'rationally based on the witness's perception,' and though one can't actually read another person's mind, one is often able to infer, from what the person says or from the expression on his face or other body language, what he is thinking." United States v. Curescu, 674 F.3d 735, 740 (7th Cir. 2012). Given that the agent was a lay witness, he was free to state his rationally-based perception of what Jordan was thinking during their face-to-face conversation.

Lest any doubt remain as to the propriety of the agent's testimony, Jordan's trial contained numerous safeguards against the danger that the agent might usurp the jury's function. See Albertelli, 687 F.3d at 447. The district court sustained several of Jordan's objections where the prosecution's question called for generalized or speculative responses. Moreover, the court afforded Jordan "very liberal cross-examination" on whether the agent

-22-

properly understood the recorded statements. This cross-examination drew out possible alternative interpretations of certain terms and phrases--for example "confidentiality" and "lender of last resort." "Where such alternatives can be offered, the plausibility of the witness' own position--unlike, say, that of a medical expert--is readily measured by the jury." Id. at 448.

Finally, and in a similar vein, Jordan argues the court erred when it allowed the agent to testify to the ultimate issue in this case. The challenged conduct is exemplified by the following excerpt from trial:

> Q [to Agent]: "How are you familiar with Mr. Prange and Mr. Jordan?"
> A: "Mr. Prange and Mr. Jordan both participated in stock fraud deals that we had done."

But, again, as we explained above, Jordan fails to recognize that this testimony was properly offered as lay opinion testimony, and lay opinion "<u>is not objectionable just because it embraces an ultimate issue</u>." Fed. R. Evid. 704(a) (emphasis added).

In sum, because the district court properly admitted the agent's interpretation as lay testimony and Jordan's trial contained sufficient safeguards against the abuse of such testimony, Jordan's objections to the agent's testimony fail.

**B. Testimony Against Prange**

Prange, on the other hand, conceded at oral argument that, because he did not object to the agent's testimony below, we review his challenge to the agent's testimony for plain error only.

-23-

See <u>Albertelli</u>, 687 F.3d at 445.  Furthermore, Prange's challenge to the agent's testimony consists of one sentence in his brief joining in Jordan's argument on this point.  As such, Prange's argument clearly fails.  We see no reason to provide any further analysis when Prange gives us nothing further to analyze.  See <u>Zannino</u>, 895 F.2d at 17.

### III. Entrapment

Both Prange and Jordan claimed entrapment throughout trial and moved for acquittal on this basis.  The court denied their motions for acquittal as a matter of law, but submitted the issue to the jury.  Alas, the jury likewise rejected the entrapment claim.  Nevertheless, Defendants maintain the evidence did not support the jury's verdict and we should hold they were entrapped as a matter of law.

We review the denial of Defendants' motion for acquittal de novo, "asking whether the evidence, construed favorably to the government, permitted rational jurors to conclude, beyond a reasonable doubt, that the defendant[s were] guilty as charged." <u>United States</u> v. <u>Sánchez-Berríos</u>, 424 F.3d 65, 77 (1st Cir. 2005) (internal quotation marks omitted).  "To defeat a sufficiency challenge premised on a defense of entrapment, the evidence, taken in the light most favorable to the government, need only support a finding of either predisposition <u>or</u> lack of improper inducement." <u>Id.</u> (emphasis added).

-24-

Defendants first argue the Government improperly induced them to engage in stock fraud. "An improper 'inducement,' however, goes beyond providing an ordinary 'opportunity to commit a crime.'" United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994) (quoting Jacobson v. United States, 503 U.S. 540, 550 (1992)). "An 'inducement' consists of an 'opportunity' plus something else-- typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." Gendron, 18 F.3d at 961; see also id. at 961–62 (listing examples of improper inducement). Defendants do not argue excessive pressure, nor could they. The record is replete with instances where the agent made clear to Defendants that they were free to walk away if they felt in any way uncomfortable with the kickback scheme. Instead, Defendants assert two alternative forms of improper inducement: First, they argue the government improperly played on the desperation of executives trying to save floundering companies. Second, they argue the very nature of the sting amounted to an improper inducement because it was designed to appear as a legitimate investor engaging in legitimate investment activities.

The record belies Defendants' first argument. Prange, for his part, did not serve as an executive or director for any of the companies seeking capital in this operation. We thus fail to see how the asserted desperation of trying to save a failing

-25-

enterprise could affect his decisional calculus. Jordan, on the other hand, initially told the agent he would use the capital to grow his business. Yet as soon as he received his first tranche, Jordan transferred that money which he did not kick back to Waters Edge to his personal bank and credit card accounts, and to the accounts of his niece, attorney, and business partner. Faced with these facts, a reasonable jury could conclude beyond a reasonable doubt that Jordan was not desperate to save his company. Rather, the jury could reasonably conclude Jordan simply "succumb[ed] to his own greed [and] the lure of easy money." United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987).

Defendants' second inducement argument, that the government made the kickback scheme appear legitimate, fares no better. Whether Defendants knew the scheme was illegal "relates to [their] intent to commit the illegal act. It does not bear on whether [they were] induced to" engage in the kickback scheme. United States v. Marino, 868 F.2d 549, 554 (3d Cir. 1989) (footnote omitted). Defendants do not argue on appeal that they lacked the requisite mens rea to commit securities fraud--indeed, an entrapment defense assumes the necessary mens rea existed.[5] See

---

[5] Jordan asserts that kickbacks are commonplace in his native country of Peru--whether they are legal in Peru he does not say. Jordan Br. at 9. Regardless, "ignorance of the law is not an excuse for violating it," United States v. Denis, 297 F.3d 25, 31 (1st Cir. 2002), and Jordan nowhere explains why his kickback-friendly background should excuse his illegal activities here.

United States v. Dyke, 718 F.3d 1282, 1286 (10th Cir. 2013).  Nor do they argue the evidence was insufficient to show they intended to commit securities fraud.  They cannot now bootstrap that argument in under the guise of entrapment.

In sum, a reasonable jury concluded the government did not improperly induce Defendants to commit securities fraud, and we cannot say the government improperly induced Defendants as a matter of law.  Given the lack of an improper inducement, Defendants' entrapment claim fails and we need not address predisposition.

**IV.  Submitting the Superseding Indictment to the Jury**

Defendants also argue the district court committed two reversible errors in submitting their superseding indictment to the jury.  Defendants first argue that the "Introduction" and "Background" sections of their indictment asserted facts that had not been proven at trial and related to co-defendants who were not on trial because they had pled guilty.  Second, they argue that allowing the term "nominee companies" to remain in quotations in the indictment was tantamount to providing the jury with testimonial evidence not subject to cross-examination.

We have long followed "[t]he well nigh universal rule" that, "subject to a proper covering instruction, whether the indictment should be given to the jury for use during its deliberations is within the discretion of the trial court." United States v. Medina, 761 F.2d 12, 21 (1st Cir. 1985).  "We will find

-27-

no fault with the exercise of the court's discretion in this manner unless the defendant can show unfair prejudice as a result of the court's approach." United States v. Glantz, 847 F.2d 1, 10 (1st Cir. 1988). "Whether all or a part of the indictment is provided to the jury, one way to avoid unfair prejudice is to give a proper covering instruction." Id.

Defendants' claims of error are dubious at best. Defendants rely on allegations in the indictment relating to Steve Berman and Richard Kranitz, whose names were apparently redacted,[6] as the prime example of "asserted facts not proven at trial." But the government presented a wealth of evidence on Berman and Kranitz's involvement in the conspiracy, including recordings of numerous conversations in which they took part. Moreover, Defendants do not explain how the quotation marks around "nominee companies" transform this term into a form of testimony.

Even assuming the superseding indictment provided cause for concern, however, Defendants cannot show prejudice here both because no prejudice is obvious and because the district court gave proper covering instructions. The court instructed the jury "that an Indictment is not evidence of any kind against the defendant. It is simply the formal method that our Constitution provides for

_____

[6] The district court indicated it would redact the names of these individuals because they had entered guilty pleas. Defendants do not provide us with a copy of the indictment that was submitted to the jury, so we can only assume the district court did as promised.

-28-

charging someone with the commission of a crime." (emphasis added). The court also told the jury: "Neither are you to be concerned with the guilt of any other person or persons not on trial as a defendant in this case." In light of these instructions, we fail to see how Defendants were prejudiced by submitting to the jury the superseding indictment as redacted. See, e.g, Smith v. Jenkins, 732 F.3d 51, 69 (1st Cir. 2013) ("As it is a basic premise of our jury system that the jury follows the court's instructions, we presume that the jury acted according to its charge." (internal quotation marks and alterations omitted)).

Indeed, Defendants fail to cite a single case where a court has overturned a conviction based on a district court's discretionary decision to provide a copy of the charging instrument to the jury subject to a proper covering instruction. In his reply brief, Jordan relies on United States v. Roy, 473 F.3d 1232 (D.C. Cir. 2007), and United States v. Shafer, 455 F.2d 1167 (5th Cir. 1972). But these cases are inapposite.

In Roy, the trial court inadvertently submitted to the jury an indictment which identified specific predicate crimes to support the defendant's felon-in-possession count even though the defendant had already stipulated to his felon status. Roy, 473 F.3d at 1232. This violated prior D.C. Circuit precedent which established that, "at least when the defendant stipulates to the fact of a felony conviction, the district court should avoid

-29-

mentioning the nature of the prior felony to the jury." United States v. Jones, 67 F.3d 320, 325 n.10 (D.C. Cir. 1995). Nevertheless, the D.C. Circuit affirmed the defendant's conviction on plain error review, holding that the defendant was not prejudiced because, among other things, the trial court took back the incorrect indictment and gave a sufficient curative instruction. Roy, 473 F.3d at 1239. In so holding, the D.C. Circuit noted that giving a copy of the indictment "often carries significant risks and has few corresponding benefits." Id. at 1237 n.2. But it also recognized that submitting the indictment to the jury is "common practice," and even "assume[d] that it would have been within the district court's discretion to submit a properly redacted indictment to the jury in this case." Id.

In Shafer, the Fifth Circuit held "[n]umerous . . . items were erroneously submitted to the jury, including a copy of the indictment showing substantive charges which had been dismissed, and a blackboard on which the prosecutor had summarized the testimony of various prosecution witnesses." Shafer, 455 F.2d at 1170. The most prejudicial of these items were (1) "the sworn complaint by a customs agent on the basis of which arrest warrants of defendants had been obtained," which "was, in effect, a statement that defendants were guilty," and (2) a copy of a hotel bill, which had not been admitted into evidence at trial, tying the defendants to the alleged offenses. Id. at 1169. Indeed, the

-30-

Fifth Circuit did not reverse the defendants' convictions there based on the submission of their indictment listing dismissed charges. Rather, "[w]ithout considering [the indictment] in detail," the Fifth Circuit concluded, "we are forced to [reverse], based on the complaint and the hotel bill." Id. at 1170. Furthermore, there is no indication that the district court there gave any covering instruction as to the indictment.

Defendants have not shown any particular statements in the indictment that were not supported by evidence presented at trial. Nor do they show how any improprieties in the indictment caused prejudice so egregious as to be beyond the reach of the court's covering instructions. As such, we cannot say the court abused its discretion in submitting the superseding indictment to the jury.

**V. Sentencing Issues**

Defendants also challenge their sentences on various grounds. "We review sentences for reasonableness, a task composed of both procedural and substantive inquiries." United States v. Innarelli, 524 F.3d 286, 291 (1st Cir. 2008). "We first review the procedural component of the sentence for abuse of discretion." Id. at 292. "[P]rocedural errors amounting to an abuse of discretion might include failing to calculate (or improperly calculating) the Guidelines range . . . or failing to adequately explain the chosen sentence--including an explanation for any

-31-

deviation from the Guidelines range."  Id. (internal quotations marks omitted).  Only if this review reveals no abuse of discretion do we examine the substantive reasonableness of the sentence imposed.  See id.

**A. Jordan's Obstruction-of-Justice Enhancement**

Jordan argues the district court erroneously added a two-level enhancement for obstruction of justice to his offense level calculation.  "We review for clear error the sentencing court's factbound determination that an obstruction of justice occurred." United States v. Quirion, 714 F.3d 77, 79 (1st Cir. 2013). "[W]here the record supports at least two permissible inferences, the factfinder's choice between them cannot be clearly erroneous." United States v. Balsam, 203 F.3d 72, 89 (1st Cir. 2000).

The Guidelines recommend increasing a defendant's offense level by two levels if "(1) the defendant willfully . . . attempted to obstruct or impede[] the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct . . . ."  U.S.S.G. § 3C1.1.  The commentary to § 3C1.1 specifically lists "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding," as an example of obstruction of justice

warranting a two-level enhancement.   Id. at § 3C1.1 cmt. 4(C) (emphasis added).

Recall that, in response to a subpoena, Jordan initially produced, along with various other correspondence, an e-mail referencing the fraudulent consulting fees with the word "consulting" in quotation marks.  He later produced this e-mail's attachments with a copy of the same e-mail, with an identical time stamp (August 31, 2011, at 8:53 a.m.), except that "consulting" was no longer in quotation marks.  The PSR asserted this warranted a two-level enhancement because it showed Jordan had deleted the quotation marks before reproducing the e-mail and therefore "altered an e-mail chain . . . that was produced pursuant to a subpoena."  At sentencing, Jordan offered an alternate explanation: He "typically sends two or three e-mails on different servers because he has a lot of e-mail problems."  And, in this instance, he sent two e-mails to his lawyer, but in the second e-mail he "thought better of putting in those quotations."  The government argued this explanation was "nonsensical."  Ultimately, the court agreed with the government's position, and found Jordan obstructed justice by altering the e-mail.

Although Jordan's alternate explanation may be possible, the PSR's theory is much more plausible given the identical timestamp.  The district court accordingly could not commit clear

error by adopting the PSR's factual predicate, warranting a two-level enhancement under § 3C1.1.

**B.  Prange's Management Enhancement**

Prange attacks the district court's imposition of a two-level management enhancement.  In preparing for Prange's sentencing, the government sought a four-level enhancement under U.S.S.G. § 3B1.1(a), asserting Prange organized or lead five or more participants.  Prange's PSR, however, maintained no such enhancement should apply because "Prange did not direct his co-conspirators, each of whom willingly became a part of, and played an active role in, the scheme."  At sentencing, the court stated that Prange "may not be deserving of a full four-level enhancement for his role in the offense as a leader or organizer, but he is surely deserving of at least a two-level enhancement for his management and supervisory role."  The court accordingly enhanced Prange's offense level by two levels.

The Guidelines authorize a two-level enhancement in cases where "the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . ." U.S.S.G. § 3B1.1(c). To justify the two-level enhancement, "[e]vidence of the defendant's role . . . need only show that he 'exercised authority or control over another participant on one occasion.'"  United States v. Flores-De-Jesús, 569 F.3d 8, 34 (1st Cir. 2009) (citation omitted).  Indeed, simply "recruiting" a co-defendant,

-34-

"by itself, constitutes a 'managerial' function under § 3B1.1." United States v. Savarese, 686 F.3d 1, 20 (1st Cir. 2012). "It is not enough, however, that the defendant merely controlled, organized, or managed criminal activities; rather, he must instead control, organize, or manage criminal actors." Flores-De-Jesús, 569 F.3d at 34 (emphasis in original) (quoting United States v. Ofray-Campos, 534 F.3d 1, 40 (1st Cir. 2008)).

The district court based this enhancement on two alternate findings: (1) "that [Prange] was at least a manager and supervisor," or (2) that he "exercised management responsibilities over the property, assets or activities of a criminal organization." Although the court's second finding, may warrant an upward departure, it is not a valid basis for an offense level enhancement under § 3B1.1. See id. at cmt. 2. Nevertheless, the record amply supports the court's first finding: that Prange was at least a manager or supervisor. At a minimum, Prange recruited Jordan and multiple other executives into this scheme by introducing them to E.H., gauging their willingness to issue kickbacks, and recommending them to the agent. Thus, the court did not clearly err in finding Prange was "at least a manager or supervisor," warranting a § 3B1.1 two-level enhancement.

## C. Calculation of Loss

Both Defendants argue the district court made two errors in calculating the amount of loss attributed to them. First, they

argue they should have been given credit for the kickbacks paid because they unwittingly paid these kickbacks to the government. Second, they argue they should be given credit for the value of the stock purchased by the government in these fraudulent transactions.

"We review the district court's interpretation and application of the Guidelines de novo; we review related findings of fact, including the court's calculation of amount of loss, for clear error." Innarelli, 524 F.3d at 290. The Guidelines define "loss" as "the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). "We have endorsed a pragmatic, fact-specific approach," to calculating such loss, "stating that 'loss should be calculated using the entire price paid for the product, unreduced by any offsetting value,' if 'the product misrepresented by the defendant is worthless.'" United States v. Ihenacho, 716 F.3d 266, 278 (1st Cir. 2013) (citation omitted).

Defendant's argument that they should be given credit for the kickback plainly fails. To give Defendants credit for the kickback would ignore the fact that loss under § 2B1.1 includes intended loss, which "includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation . . . )." U.S.S.G. § 2B1.1, cmt. 3(A)(ii). Here, by taking money Defendants believed belonged to investors in a hedge fund and paying fifty percent as a kickback to the corrupt manager's personal nominee company, Defendants intended to cause a

loss to the hedge fund investors of at least the amount of the kickback paid. The fact that no investors actually suffered this intended loss is irrelevant under § 2B1.1.

On the other hand, the government admits it received shares of restricted stock in the companies to which it sent tranches. The government also admits that if the shares received carry any fair market value, the district court should have reduced its loss calculation by that amount. See id. at cmt. 3(E)(i) ("Loss shall be reduced by . . . the fair market value of the property returned and the services rendered . . . ."). But the district court never made any findings as to the value of these shares. Nevertheless, the government asserts the district court must have found these particular shares were worthless because Defendants did not present sufficient evidence of their value. We are not so sure.

Defendants argued below that the PSRs should have credited them with the value of the shares the government received. The PSRs responded to these objections by reasoning that Defendants should be held accountable for the total value of the transaction or transactions simply because they knew these transactions were not legitimate. The government, for its part, argued at Jordan's sentencing that the Vida Life stock was worthless simply because there was no market for it. But neither reason holds water.

Indeed, the PSRs' reasoning flies in the face of our precedent. In calculating loss based on fraud, we have long recognized

> that there are two types of fraud: "The first type of fraud implicates the 'true con artist,' . . . who intends only to pocket the money without rendering [anything] in return. The second type of fraud involves a person who would not have attained the contract or loan but for the fraud, but who fully intends to perform."

United States v. Blastos, 258 F.3d 25, 30 (1st Cir. 2001) (quoting United States v. Haggert, 980 F.2d 8, 12–13 (1st Cir. 1992)); see also United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991) ("A thief who steals $100,000 is more culpable than a salesman who obtains $100,000 by selling a victim an $80,000 house he fraudulently represents as being worth $100,000. In the latter case, it makes no sense to suggest that $100,000 is the accurate measure of the victim's loss."). Yet, by holding Defendants responsible for the full amount of the fraudulent transactions simply because they knew the transactions were fraudulent, the PSRs' response to Defendants' objections would render the distinction between these two types of fraud illusory.

Furthermore, on appeal, the parties do not dispute that the common stock of the companies at issue had some value. At sentencing, the government asserted no market existed for Vida Life stock because "in contrast to [the] other companies . . . that were at issue," there was "virtually no trading" of Vida Life shares. (emphasis added). But the government's own witness at trial

-38-

testified to multiple trades of Vida Life common shares in 2011 at between $0.03 and $0.05 per share. In its response brief, the government argues these particular shares were worthless because they were restricted shares, which were not fully transferable or salable. Of course, restricted shares may be less valuable than common shares because they are not freely transferable. But the government cites no authority, from the record or elsewhere, for the proposition that the shares the government acquired were worthless simply because they were restricted. Au contraire, courts often assign a value to restricted shares. See, e.g., United States v. Roush, 466 F.3d 380, 385-86 (5th Cir. 2006) ("[T]he fact that the stock was restricted at all times during 1998 did not render its fair market value either zero or de minimus for the purposes of income calculations."); Scully v. US WATS, Inc., 238 F.3d 497, 514 (3d Cir. 2001) (affirming the district court's refusal to discount the value of stock shares simply because they were restricted).

At oral argument, the government asserted the district court must have found the shares were worthless because Defendants did not provide sufficient evidence to show the shares had any particular value, and thus, the court was entitled to disregard them in its amount of loss calculation. But, again, the district court nowhere made such a finding. Rather, the court's terse explanation as to the amount of loss indicates it probably followed

one of the original erroneous arguments put forth by the PSR and the government. As to Jordan, the court stated "the loss was, in fact, $32,000, the full amount of the transaction, and <u>not some netted out amount . . . reflective of [the] alleged value of the transferred stock</u>." (emphasis added). Similarly, the court stated only that Prange "is responsible for the loss <u>as calculated by the probation officer</u>, namely, including all of the amounts paid to the co-conspirators." (emphasis added). Perhaps the court <u>could</u> have found these shares were worthless, but the record does not show the court <u>must</u> have held this view. Indeed, the government suggested at oral argument that, to the extent we are concerned about the district court's failure to make any factual findings on this point, we should remand to allow the court to make those findings.

There is a strong likelihood that the court based Defendants' amount of loss enhancements on an erroneous legal ground rather than a possible unspoken factual determination. Furthermore, a finding that the shares at issue had even a very small value could make a significant difference under the Guidelines.[7] As such, we accept the government's invitation and

---

[7] For example, given that the district court held Jordan responsible for $32,000 in loss, if the Government's 400,000 Vida Life shares had a combined value of even $2,000--or just half a cent per share--Jordan could be held responsible for no more than $30,000 in loss and his amount of loss enhancement would be reduced by two levels. <u>See</u> U.S.S.G. § 2B1.1(b)(1)(D). Similarly, because Prange was held responsible for $95,000 in loss, if all of the shares procured from all of Prange's co-conspirators had a combined value of $25,000 or more, he could be held responsible for no more

remand these cases for resentencing so the district court can make factual findings as to the value of the pertinent shares acquired by the government during the sting.[8]

## VI.  Conclusion

For the reasons state above, we AFFIRM Defendants' convictions but REMAND their cases to the district court with instruction to vacate Defendants' sentences and resentence them according to this opinion.

_____

than $70,000 in loss, and his amount of loss enhancement would likewise be reduced.  See id. at (b)(1)(E).

[8]  Because the district court committed procedural error in formulating Defendants' sentences, we need not address the substantive reasonableness of those sentences here.