# United States Court of Appeals
## For the First Circuit

No. 14-1305

UNITED STATES OF AMERICA,

Appellee,

v.

ALBERT REDA,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before
Howard, Chief Judge,
Souter,[*] Associate Justice,
and Lipez, Circuit Judge.

William J. Kopeny for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

May 29, 2015

---

[*]      Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** Albert Reda was caught in an FBI sting targeting the market for penny stocks and was convicted of wire and mail fraud. See 18 U.S.C. §§ 1343, 1341. His appeal raises two claims of trial error (evidentiary rulings with respect to a key witness and purportedly improper vouching by the government) and two of sentencing error (application of an enhancement for violating securities laws and the loss calculation). We affirm as to both trial error claims and the sentencing enhancement. As to the loss calculation, the government has confessed error, and we remand for resentencing.

I.

Details of this FBI sting, titled "Operation Penny Pincher," were set out in United States v. Prange, 771 F.3d 17, 21-25 (1st Cir. 2014). We will assume familiarity with that case, and describe here only those details necessary for resolving this one.

In Operation Penny Pincher, the FBI created a fictitious hedge fund and designated an undercover agent as its pretended, corrupt manager. Well-connected people (some of whom were FBI cooperators) typically arranged meetings between the manager and executives of penny stock companies. These latter individuals were identified in advance as likely to be interested in proposals by the manager to invest the fund's money in the executives' penny stocks at premium prices in return for 50% kickbacks concealed through phony consulting agreements solely for the manager's benefit.

-2-

Reda was one such executive, being chairman of the board of 1st Global Financial Corporation, which was in the business of purchasing distressed real estate. Arrangements were made for him to meet with the agent on June 29, 2011.

The day before that, a cooperating witness, E.H., called Reda to discuss the meeting, and during their recorded conversation, Reda asked for "more detail" on the deal that would be discussed the next day. E.H. explained that the hedge fund buys shares for an above-market price, half of which would be reclaimed by a "consulting bill" from one of several "different nominee companies" so the "accountants don't . . . have any suspicions." E.H. specifically explained that this "money goes back to this gentleman at the fund" and "he doesn't share it with . . . his partners," to which Reda responded, "Right. I understand."

The subsequent conversation among the agent, E.H., and Reda at the June 29th meeting was also recorded. The agent told Reda that, although he normally engaged in a four to six week due diligence enquiry before investing in a company, "this isn't going to be one of those deals." He continued with the following explanation of this "non-traditional deal":

> [M]y financing is fifty percent[.] [F]ifty percent gets
> kicked back to me, right off the top[.] [F]ortunately I
> fund that, so it's no money out of your pocket but that's
> what I mean kinda, [I]'m the lender of last resort. . .
>     [T]he other advantage is I don't, because, because
> this is the type of deal that this is, I don't get into
> your business. I don't, I don't really, I won't run,
> help run your business[.] I don't wanna help run your

business[.]  I don't want to have a say[.]  I don't want
a say[.]  [Y]our business is your business[.]  [I]f
you're successful, then I win, my fund wins[.] [I]f
you're unsuccessful, then, well, I win anyway and, you
win to an extent, because [y]ou've got that working
capital that you need.

He then offered to pay $5,000,000 for restricted shares, where "two and half [would] go[] back to" him, a deal that he asked Reda to keep "confidential," so that the fund "won't know anything about the two and half going back to" him.  To create a "paper trail," the agent would "invoice [the kickback] through a nominee consulting company," but he added, "I don't consult you on anything."

At no point during this meeting did Reda express any reservations or indicate anything but agreement.  When the agent emphasized that the deal had to be kept secret from his fund, Reda said that was "[f]ine with me."  His only question during the conversation was logistical, about the address to which he should send the 1st Global stock certificates.

The deal was to be done through tranches of increasing dollar value.  The first tranche was one of $32,000, for 320,000 restricted shares at 10 cents each (even though the common shares were trading at 4 to 5 cents).  Shortly after the June 29th meeting, Reda and the agent executed the stock purchase and consulting agreements, and Reda mailed, through Federal Express, a stock certificate for the 320,000 restricted shares.  The FBI responded with a wire transfer of $32,000 to Reda, who later wired

-4-

$16,000 to the bank account of the agent's fake consulting company.

The agent and Reda next planned for a second tranche of $75,000, this time for 500,000 restricted shares at 15 cents each. Reda sent the agent a stock purchase agreement for these shares as well as a modified invoice for $37,500 in consulting services (prepared by Reda on behalf of the agent). These were promptly followed by Reda's mailing, again through Federal Express, of a stock certificate for the 500,000 restricted shares. This transaction, however, was never completed, owing to Reda's arrest sometime later on charges of wire and mail fraud.

At Reda's trial, the government's principal witness was the undercover agent, who not only explained the circumstances of the sting and authenticated the government's recording of the June 29th meeting, but also gave his own interpretations of statements he made during that conversation. He explained, for example, that the reason he told Reda that he normally spends four to six weeks on due diligence was to indicate that this transaction, by contrast, "wasn't legitimate." So, too, he said that he had emphasized confidentiality because he was "trying to convey that this [deal] is wrong."

Reda's defense was that he did not understand the deal to be illegitimate, but the jury convicted him on both the wire and mail fraud counts. The district court calculated Reda's sentencing range under the Sentencing Guidelines at 30-37 months, but imposed

a below-Guidelines prison sentence of 26 months.

                                II.

Reda raises a host of evidentiary objections to the undercover agent's testimony.  He contends that it was improper expert opinion testimony under Federal Rules of Evidence 702 and 704; that it was improper lay opinion testimony under Rule 701, because it was lacking foundation, unhelpful to the jury, and improperly called for a legal conclusion; and that it was unduly prejudicial under Rule 403.  He further says that these errors cumulatively violated his due process right to a fair trial.

Most of these challenges, however, were not preserved below. Reda objected at trial to the agent's testimony on two grounds only: (1) that statements that the deal was "not legitimate" and "ma[d]e no economic sense" were improper expert testimony; and (2) that the term "kickback" was conclusory.  We review these two error claims for abuse of discretion, and the rest, unpreserved, for plain error, United States v. Rosado-Pérez, 605 F.3d 48, 54 (1st Cir. 2010), the latter permitting reversal only if we find (1) an error (2) that is clear and obvious, (3) affecting the defendant's substantial rights, and (4) seriously impairing the integrity of judicial proceedings, United States v. Santiago, 775 F.3d 104, 106 (1st Cir. 2014).[1]

---

[1] Reda filed a pre-trial motion in limine making some of the other arguments he now presses on appeal.  The district court denied the motion but advised Reda that he was free to renew his

The district court did not abuse its discretion in permitting the undercover agent to testify under Rule 701 as a lay, and not expert, witness, a conclusion dictated by <u>Prange</u>, in which the same undercover agent also testified, and quite similarly. The defendants there raised this very objection, and we rejected it, explaining at length why the lay designation was correct. Here, as in <u>Prange</u>, the agent used prefatory language appropriate to avoid any undue suggestion of expert character (e.g., "This is my attempt to make clear that . . ."), and we too "fail to see why we should treat the agent's interpretation of his own conversations as expert testimony." <u>Prange</u>, 771 F.3d at 27. Indeed, far from offering an expert opinion about the functioning of the financial industry, the agent was explaining, as the district judge put it, "why the deal . . . was structured [this] way." As we explained in <u>Prange</u>, the agent's own explanation of his objectives in such fact-bound circumstances mitigated the risk of investing his testimony with the persuasive premium of an expert's conclusion. <u>Id.</u>

Nor do we find an abuse of discretion in allowing the agent to use the term, "kickback." Reda objected below that such testimony went to the ultimate legal question, but his argument fails on law and fact. To begin with, as this was lay, and not expert, opinion testimony, it is "not [automatically] objectionable just because it

objections during trial. Reda did not do so, however, and thus, under circuit law, he forfeited these arguments. <u>See</u> <u>United States v. Almeida</u>, 748 F.3d 41, 50 (1st Cir. 2014).

-7-

embraces an ultimate issue." Fed. R. Evid. 704(a). To be sure, the Rule does not countenance "the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 Advisory Committee's Note on 1972 Proposed Rules. But protection against that sort of usurpation is found in the criteria for admitting lay opinion testimony, id., that it be "helpful to [a jury's] clearly understanding the witness's testimony or determining a fact in issue." Fed. R. Evid. 701(b); see also United States v. Meises, 645 F.3d 5, 16-17 (1st Cir. 2011); United States v. Díaz-Arias, 717 F.3d 1, 11-12 (1st Cir. 2013). Here, the district court found that "kickback" was not presented as a legal term but merely as "a factual shorthand that money is coming back to him." The pithy colloquialism was suited to the task of helping the jury on an issue of fact, and the court's common sense in seeing it this way is underscored by its demonstrated care in policing the line between conclusory and descriptive terminology. Although it overruled objections to the word "kickback" for the reasons mentioned, it sustained objections when the agent testified that "[a] kickback is a form of bribery" and when he described the deal as "illegitimate finance."

The only other conceivable basis for Reda's objection to the term "kickback," as lay opinion testimony, is that it might lack proper foundation in fact. Although it does not appear that Reda pressed this particular theory to the district court, he raises it

-8-

on appeal and we conclude that it lacks merit.  Reda argues by way of comparison with Prange, pointing to a conversation in that case in which E.H. referred to the scheme as "illegal" and to another in the course of which the agent spoke of cheating his own fund.  771 F.3d at 24.  These exchanges, he correctly assumes, were details providing a factual basis for interpreting the defendant's words and actions as indicating participation in a scheme he understood to be fraudulent.  Id. at 27-29.  While there were no exact verbal analogs in Reda's dealings, it is impossible to imagine that anyone operating in the business world would fail to understand that illegality was afoot in a proposal to dispense with any due diligence enquiry before buying penny stocks with hedge fund money at twice the price of putatively available shares, subject to a fifty-percent kickback to a nominee corporation for personal benefit to the fund manager.  The foundation for the agent's testimony here was thus as sound as it was in Prange, save on the assumption that Reda was an uncomprehending naif, a proposition for which he himself provides no foundation and which is belied by his position as chairman of 1st Global.  In sum, there was no abuse of discretion in admitting the agent's lay opinion testimony using the term "kickback."

What remains are Reda's unpreserved objections, listed above.  Under plain error review, we believe they are foreclosed by Prange, which discussed and rejected the same arguments.  771 F.3d at 25-

30.[2]  While Reda correctly observes that the factual details of his case and <u>Prange</u> are not identical, we think he rests his argument on details that fail to distinguish the cases.  The circumstances revealed in the two cases are sufficiently similar to conclude with ease that the district court committed no obvious error in admitting the undercover agent's testimony.  And having concluded that none of Reda's evidentiary challenges has any merit, we reach the same result with respect to his related due process claims.

## III.

Reda levels a different sort of objection at the portion of the undercover agent's testimony that explained that Reda had been vetted or "predicated" in advance of the June 29th meeting.  Reda argues that, by presenting evidence to the jury that it had already identified Reda as a likely criminal, the government improperly "vouched" for its case and its witnesses, in violation of due process.

This argument is remarkable because it was Reda himself whose cross-examination of the agent elicited the testimony to which he now objects.  In this circuit, "[o]rdinarily, a party who elicits evidence would waive any claim that its admission was error." <u>United States</u> v. <u>Harris</u>, 660 F.3d 47, 52 (1st Cir. 2011); <u>see also</u>

---

[2] The same is true of Reda's prejudice argument under Rule 403.  Although no appellant raised such an objection in <u>Prange</u>, Reda's prejudice argument is intertwined with his other unpreserved objections and thus falls with the rest.

<u>United States</u> v. <u>Etienne</u>, 772 F.3d 907, 918 (1st Cir. 2014) ("We will not now suffer to hear Etienne complain of a purported error for which he alone was responsible."). Reda's counsel failed to request to withdraw the questions that elicited this information or to move that the damaging evidence be stricken. Accordingly, we see no reason to make an exception to the general rule here. <u>See</u> <u>Harris</u>, 660 F.3d at 52. Thus, Reda has waived the argument.

IV.

As to sentencing, Reda first says that the district court procedurally erred in calculating his sentencing range under the Sentencing Guidelines when it applied a four-level enhancement for "a violation of securities law" under U.S.S.G. § 2B1.1(b)(19)(A), even though his company's stock was unregistered. As before, Reda failed to raise this point below, so we review for plain error.

Reda's implicit premise, that the enhancement applies only when a defendant dealt in registered securities, is unsound. The term "securities law" includes Section 10(b) of the Securities Act of 1934 and Rule 10b-5,[3] neither of which is limited to registered

---

[3] Under the application notes, "'securities law' (i) means 18 U.S.C. §§ 1348, 1350, and the provisions of law referred to in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47); and (ii) includes the rules, regulations, and orders issued by the Securities and Exchange Commission pursuant to the provisions of law referred to in such section." U.S.S.G. § 2B1.1 cmt. n. 15(A). Section 3(a)(47) of the Securities Exchange Act of 1934 in turn incorporates the entirety of the Act, and under Section 10(b) of the Act, the SEC has promulgated Rule 10b-5. <u>See</u> 17 C.F.R. § 240.10b-5.

securities. <u>See</u> 15 U.S.C. § 78c(a)(10) (defining "security" broadly, with no exclusion for unregistered securities). Because Reda's conduct here violated Rule 10b-5 by employing a fraudulent scheme relating to the sale of unregistered securities, 17 C.F.R. § 240.10b-5, the district court committed no error, plain or otherwise, in applying the enhancement.

In a related argument, Reda contends that the district court independently erred by failing to explain why it applied the enhancement. This claim, too, is subject only to plain error review, which is again unavailing. Even assuming for argument that the invocation of the securities-law enhancement required explanation beyond what the record clearly showed, it is obvious, for the reasons already mentioned, that Reda suffered no prejudice to his substantial rights and that the integrity of the judicial process was not compromised, as plain error relief would require.[4]

V.

Finally, Reda contends that the district court erred in calculating the relevant sentencing fact of loss under U.S.S.G. § 2B1.1(b)(1)(E). Because he did make this objection below, the district court's interpretation and application of the Guidelines receives de novo review and its factual findings are reviewed for

---

[4] Reda asserts that the district court failed to make factual findings in support of the four-level enhancement, but this is a new argument made on reply and thus waived. <u>See</u> <u>Corporate Technologies, Inc.</u> v. <u>Harnett</u>, 731 F.3d 6, 13 (1st Cir. 2013).

clear error.  United States v. Jones, 778 F.3d 375, 383 (1st Cir. 2015).

Reda set up two specific transactions with the undercover agent, the first for $32,000 and the second for $75,000, in which half of each payment was to be kicked back to the agent.  There is no dispute that, in such a scheme, the loss calculation properly includes the kickbacks, here $53,500.  See Prange, 771 F.3d at 35.[5] The disagreement now is over how much of the balance should be accounted as loss.  Reda argued below that he should not be charged with whatever value the restricted shares had, but the district court accepted an opaque argument from the government, that the whole dollar amount of each transaction should be treated as actual or intended loss because "any impact on the value of the stock was a result of the criminal conduct."  The district court consequently calculated the loss as $107,000.

On appeal, the government confesses error.  It now agrees that the district court's categorical refusal to credit the restricted shares with any demonstrable fair market value because Reda knew the transactions to be fraudulent was wrong under our reasoning in Prange.  771 F.3d at 35 ("[I]f the shares received carry any fair market value, the district court should have reduced its loss calculation by that amount."); id. at 36 (stating that Probation

_____

[5] To the extent that Reda argued otherwise in his opening brief, filed before Prange was handed down, he wisely appears to have abandoned that position in his reply.

was incorrect to "hold[] Defendants responsible for the full amount of the fraudulent transactions simply because they knew the transactions were fraudulent"). There we remanded for the district court to find the value of the shares acquired by the government, id., at 36-37, and a similar remand is called for here, see United States v. McGhee, 651 F.3d 153, 158 (1st Cir. 2011) (stating that a remand is the ordinary disposition if the district court misapplied the Guidelines).

The government urges otherwise, arguing that the error is harmless because any credit due for the value of the restricted shares (based on evidence of the value of common shares in the record) is insufficient to push the loss calculation below the $70,000 threshold under U.S.S.G. § 2B1.1(b)(1)(E), and thus the Guidelines calculation would not change.[6] But the factual

---

[6] The government also makes a technical argument that Reda is ineligible for any credit. Briefly summarized, the government argues that, because such credits are available only for the "fair market value of the property returned . . . before the offense was detected," U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) (emphasis added), and because Reda's fraudulent scheme was known to the undercover agent (and thus detected) before the days on which the restricted stock was transferred, Reda cannot claim a credit from the fair market value of this stock. The government admitted at oral argument that, according to its argument, no defendant ever caught in an undercover operation could ever claim a credit under the provision cited above. As clarified, the government's argument is foreclosed, albeit implicitly, by Prange. The defendants in Prange were also caught in a sting, and yet we specifically remanded for the district court to calculate the value of the restricted shares and grant the defendants a credit accordingly. 771 F.3d at 35-37. Our holding in Prange is thus inconsistent with the government's argument.

-14-

determination of the value of the shares is not so straightforward, and, in any event, fact-finding should generally be done by districts courts, not appellate courts in the first instance. And even if the government's factual response is correct, the error may still matter. The district court here imposed a below-Guidelines sentence; if the loss calculation turns out to be lower, even if greater than $70,000, the district court may choose in its discretion to impose a different below-Guidelines sentence. In short, the case is "not certain enough to find harmless error," McGhee, 651 F.3d at 158, and thus a remand is required.

## VI.

The convictions are affirmed. The sentence is vacated and the case remanded for resentencing consistent with this opinion.